## BARENBLATT *v.* UNITED STATES.

No. 35. Argued November 18, 1958.—Decided June 8, 1959.

*Edward J. Ennis* argued the cause for petitioner. With him on the brief were *Nanette Dembitz* and *David Scribner.*

*Philip R. Monahan* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Acting Assistant Attorney General Yeagley* and *Doris H. Spangenburg.*

Briefs of *amici curiae* urging reversal were filed by *Ralph F. Fuchs* and *Leo A. Huard* for the American Association of University Professors, and by *Nathan Witt* and *John M. Coe* for the National Lawyers Guild.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Once more the Court is required to resolve the conflicting constitutional claims of congressional power and of an individual's right to resist its exercise. The congressional power in question concerns the internal process of Congress in moving within its legislative domain; it involves the utilization of its committees to secure "testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." *Mc-Grain* v. *Daugherty,* 273 U. S. 135, 160. The power of inquiry has been employed by Congress throughout our history, over the whole range of the national interests concerning which Congress might legislate or decide upon due investigation not to legislate; it has similarly been utilized in determining what to appropriate from the national purse, or whether to appropriate. The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.

Broad as it is, the power is not, however, without limitations. Since Congress may only investigate into those areas in which it may potentially legislate or appropriate,

112

it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government. Lacking the judicial power given to the Judiciary, it cannot inquire into matters that are exclusively the concern of the Judiciary. Neither can it supplant the Executive in what exclusively belongs to the Executive. And the Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action, more particularly in the context of this case the relevant limitations of the Bill of Rights.

The congressional power of inquiry, its range and scope, and an individual's duty in relation to it, must be viewed in proper perspective. *McGrain* v. *Daugherty, supra;* Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv. L. Rev. 153, 214; Black, Inside a Senate Investigation, 172 Harpers Monthly 275 (February 1936). The power and the right of resistance to it are to be judged in the concrete, not on the basis of abstractions. In the present case congressional efforts to learn the extent of a nation-wide, indeed world-wide, problem have brought one of its investigating committees into the field of education. Of course, broadly viewed, inquiries cannot be made into the teaching that is pursued in any of our educational institutions. When academic teaching-freedom and its corollary learning-freedom, so essential to the well-being of the Nation, are claimed, this Court will always be on the alert against intrusion by Congress into this constitutionally protected domain. But this does not mean that the Congress is precluded from interrogating a witness merely because he is a teacher. An educational institution is not a constitutional sanctuary from inquiry into matters that may otherwise be within the constitutional legislative domain merely for the reason that inquiry is made of someone within its walls.

In the setting of this framework of constitutional history, practice and legal precedents, we turn to the particularities of this case.

We here review petitioner's conviction under 2 U. S. C. § 192[1] for contempt of Congress, arising from his refusal to answer certain questions put to him by a Subcommittee of the House Committee on Un-American Activities during the course of an inquiry concerning alleged Communist infiltration into the field of education.

The case is before us for the second time. Petitioner's conviction was originally affirmed in 1957 by a unanimous panel of the Court of Appeals, 100 U. S. App. D. C. 13, 240 F. 2d 875. This Court granted certiorari, 354 U. S. 930, vacated the judgment of the Court of Appeals, and remanded the case to that court for further consideration in light of *Watkins* v. *United States,* 354 U. S. 178, which had reversed a contempt of Congress conviction, and which was decided after the Court of Appeals' decision here had issued. Thereafter the Court of Appeals, sitting *en banc,* reaffirmed the conviction by a divided court. 102 U. S. App. D. C. 217, 252 F. 2d 129. We again granted certiorari, 356 U. S. 929, to consider petitioner's statutory and constitutional challenges to his conviction, and particularly his claim that the judgment below cannot stand under our decision in the *Watkins* case.

Pursuant to a subpoena, and accompanied by counsel, petitioner on June 28, 1954, appeared as a witness before

---

[1] "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

this congressional Subcommittee. After answering a few preliminary questions and testifying that he had been a graduate student and teaching fellow at the University of Michigan from 1947 to 1950 and an instructor in psychology at Vassar College from 1950 to shortly before his appearance before the Subcommittee, petitioner objected generally to the right of the Subcommittee to inquire into his "political" and "religious" beliefs or any "other personal and private affairs" or "associational activities," upon grounds set forth in a previously prepared memorandum which he was allowed to file with the Subcommittee.[2] Thereafter petitioner specifically declined to answer each of the following five questions:

"Are you now a member of the Communist Party? [Count One.]

"Have you ever been a member of the Communist Party? [Count Two.]

"Now, you have stated that you knew Francis Crowley. Did you know Francis Crowley as a member of the Communist Party? [Count Three.]

"Were you ever a member of the Haldane Club of the Communist Party while at the University of Michigan? [Count Four.]

"Were you a member while a student of the University of Michigan Council of Arts, Sciences, and Professions?" [Count Five.]

In each instance the grounds of refusal were those set forth in the prepared statement. Petitioner expressly disclaimed reliance upon "the Fifth Amendment."[3]

---

[2] In the words of the panel of the Court of Appeals which first heard the case this memorandum "can best be described as a lengthy legal brief attacking the jurisdiction of the committee to ask appellant any questions or to conduct any inquiry at all, based on the First, Ninth and Tenth Amendments, the prohibition against bills of attainder, and the doctrine of separation of powers." 100 U. S. App. D. C., at 17, n. 4, 240 F. 2d, at 879, n. 4.

[3] We take this to mean the privilege against self-incrimination.

Following receipt of the Subcommittee's report of these occurrences the House duly certified the matter to the District of Columbia United States Attorney for contempt proceedings. An indictment in five Counts, each embracing one of petitioner's several refusals to answer, ensued. With the consent of both sides the case was tried to the court without a jury, and upon conviction under all Counts a general sentence of six months' imprisonment and a fine of $250 was imposed.

Since this sentence was less than the maximum punishment authorized by the statute for conviction under any one Count,[4] the judgment below must be upheld if the conviction upon any of the Counts is sustainable. See *Claassen* v. *United States,* 142 U. S. 140, 147; *Roviaro* v. *United States,* 353 U. S. 53; *Whitfield* v. *Ohio,* 297 U. S. 431. As we conceive the ultimate issue in this case to be whether petitioner could properly be convicted of contempt for refusing to answer questions relating to his participation in or knowledge of alleged Communist Party activities at educational institutions in this country, we find it unnecessary to consider the validity of his conviction under the Third and Fifth Counts, the only ones involving questions which on their face do not directly relate to such participation or knowledge.

Petitioner's various contentions resolve themselves into three propositions: First, the compelling of testimony by the Subcommittee was neither legislatively authorized nor constitutionally permissible because of the vagueness of Rule XI of the House of Representatives, Eighty-third Congress, the charter of authority of the parent Committee.[5] Second, petitioner was not adequately apprised of the pertinency of the Subcommittee's questions to the

---

[4] See Note 1, *supra.*

[5] H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 15, 18, 24. The Committee's charter appears as paragraph 17 (b) of Rule XI. References to the Rule throughout this opinion are intended to signify that paragraph.

subject matter of the inquiry. Third, the questions petitioner refused to answer infringed rights protected by the First Amendment.

## SUBCOMMITTEE'S AUTHORITY TO COMPEL TESTIMONY.

At the outset it should be noted that Rule XI authorized this Subcommittee to compel testimony within the framework of the investigative authority conferred on the Un-American Activities Committee.[6] Petitioner contends that *Watkins* v. *United States, supra,* nevertheless held the grant of this power in all circumstances ineffective because of the vagueness of Rule XI in delineating the Committee jurisdiction to which its exercise was to be appurtenant. This view of *Watkins* was accepted by two of the dissenting judges below. 102 U. S. App. D. C., at 124, 252 F. 2d, at 136.

The *Watkins* case cannot properly be read as standing for such a proposition. A principal contention in *Watkins* was that the refusals to answer were justified because the requirement of 2 U. S. C. § 192 that the questions asked be "pertinent to the question under inquiry" had not been satisfied. 354 U. S., at 208–209. This Court reversed the conviction solely on that ground, holding that Watkins had not been adequately apprised of the subject matter of the Subcommittee's investigation or the per-

---

[6] "The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 15, 18, 24. The Rule remains current in the same form. H. Res. 7, 86th Cong., 1st Sess., Cong. Rec., Jan. 7, 1959, p. 13.

tinency thereto of the questions he refused to answer. *Id.*, at 206–209, 214–215; and see the concurring opinion in that case, *id.*, at 216. In so deciding the Court drew upon Rule XI only as one of the facets in the total *mise en scène* in its search for the "question under inquiry" in that particular investigation. *Id.*, at 209–215. The Court, in other words, was not dealing with Rule XI at large, and indeed in effect stated that no such issue was before it, *id.*, at 209. That the vagueness of Rule XI was not alone determinative is also shown by the Court's further statement that aside from the Rule "the remarks of the chairman or members of the committee; or even the nature of the proceedings themselves, might sometimes make the topic [under inquiry] clear." *Ibid.* In short, while *Watkins* was critical of Rule XI, it did not involve the broad and inflexible holding petitioner now attributes to it.[7]

Petitioner also contends, independently of *Watkins*, that the vagueness of Rule XI deprived the Subcommittee of the right to compel testimony in this investigation into Communist activity. We cannot agree with this contention, which in its furthest reach would mean that the House Un-American Activities Committee under its existing authority has no right to compel testimony in any circumstances. Granting the vagueness of the Rule, we may not read it in isolation from its long history in the House of Representatives. Just as legislation is often given meaning by the gloss of legislative reports, administrative interpretation, and long usage, so the proper meaning of an authorization to a congressional committee is not to be derived alone from its abstract terms unrelated to the definite content furnished them by the course of congressional actions. The Rule comes to us with a

---

[7] Had *Watkins* reached to the extent now claimed by petitioner a reversal of the judgment of the Court of Appeals, not a remand for further consideration, would have been required when this case first came to us.

118

"persuasive gloss of legislative history," *United States* v. *Witkovich*, 353 U. S. 194, 199, which shows beyond doubt that in pursuance of its legislative concerns in the domain of "national security" the House has clothed the Un-American Activities Committee with pervasive authority to investigate Communist activities in this country.

The essence of that history can be briefly stated. The Un-American Activities Committee, originally known as the Dies Committee, was first established by the House in 1938.[8] The Committee was principally a consequence of concern over the activities of the German-American Bund, whose members were suspected of allegiance to Hitler Germany, and of the Communist Party, supposed by many to be under the domination of the Soviet Union.[9] From the beginning, without interruption to the present time, and with the undoubted knowledge and approval of the House, the Committee has devoted a major part of its energies to the investigation of Communist activities.[10] More particularly, in 1947 the Committee an-

[8] H. Res. 282, 75th Cong., 3d Sess., 83 Cong. Rec. 7568, 7586.

[9] See debate on the original authorizing resolution, 75th Cong., 3d Sess., 83 Cong. Rec. 7567, 7572–7573, 7577, 7583–7586.

[10] H. R. Rep. No. 2, 76th Cong., 1st Sess.; H. R. Rep. No. 1476, 76th Cong., 3d Sess.; H. R. Rep. No. 1, 77th Cong., 1st Sess.; H. R. Rep. No. 2277, 77th Cong., 2d Sess.; H. R. Rep. No. 2748, 77th Cong., 2d Sess.; H. R. Rep. No. 2233, 79th Cong., 2d Sess.; H. R. Rep. No. 2742, 79th Cong., 2d Sess.; Report of the Committee on Un-American Activities to the United States House of Representatives, 80th Cong., 2d Sess., December 31, 1948 (Committee Print); H. R. Rep. No. 1950, 81st Cong., 2d Sess.; H. R. Rep No. 3249, 81st Cong., 2d Sess.; H. R. Rep. No. 2431, 82d Cong., 2d Sess.; H. R. Rep. No. 2516, 82d Cong., 2d Sess.; H. R. Rep. No. 1192, 83d Cong., 2d Sess.; H. R. Rep. No. 57, 84th Cong., 1st Sess.; H. R. Rep. No: 1648, 84th Cong., 2d Sess.; H. R. Rep. No. 53, 85th Cong., 1st Sess.; H. R. Rep. No. 1360, 85th Cong., 2d Sess.

nounced a wide-range program in this field,[11] pursuant to which during the years 1948 to 1952 it conducted diverse inquiries into such alleged Communist activities as espionage; efforts to learn atom bomb secrets; infiltration into labor, farmer, veteran, professional, youth, and motion picture groups; and in addition held a number of hearings upon various legislative proposals to curb Communist activities.[12]

In the context of these unremitting pursuits, the House has steadily continued the life of the Committee at the

---

[11] The scope of the program was as follows:

"1. To expose and ferret out the Communists and Communist sympathizers in the Federal Government.

"2. To spotlight the spectacle of having outright Communists controlling and dominating some of the most vital unions in American labor.

"3. To institute a countereducational program against the subversive propaganda which has been hurled at the American people.

"4. Investigation of those groups and movements which are trying to dissipate our atomic bomb knowledge for the benefit of a foreign power.

"5. Investigation of Communist influences in Hollywood.

"6. Investigation of Communist influences in education.

"7. Organization of the research staff so as to furnish reference service to Members of Congress and to keep them currently informed on all subjects relating to subversive and un-American activities in the United States.

"8. Continued accumulation of files and records to be placed at the disposal of the investigative units of the Government and armed services." Report of the Committee on Un-American Activities to the United States House of Representatives, 80th Cong., 2d Sess., Dec. 31, 1948, 2–3 (Committee Print).

[12] Report of the Committee on Un-American Activities to the United States House of Representatives, 80th Cong., 2d Sess., December 31, 1948, 15–21 (Committee Print); H. R. Rep. No. 1950, 81st Cong., 2d Sess. 1–10; H. R. Rep. No. 3249, 81st Cong., 2d Sess. 5–6, 27–29; H. R. Rep. No. 2431, 82d Cong., 2d Sess. 6–9; H. R. Rep. No. 2516, 82d Cong., 2d Sess. 7–67, 69–73.

commencement of each new Congress; [13] it has never narrowed the powers of the Committee, whose authority has remained throughout identical with that contained in Rule XI; and it has continuingly supported the Committee's activities with substantial appropriations.[14] Beyond this, the Committee was raised to the level of a standing committee of the House in 1945, it having been but a special committee prior to that time.[15]

In light of this long and illuminating history it can hardly be seriously argued that the investigation of Communist activities generally, and the attendant use of

[13] H. Res. 26, 76th Cong., 1st Sess., 84 Cong. Rec. 1098, 1128; H. Res. 321, 76th Cong., 3d Sess., 86 Cong. Rec. 532, 605; H. Res. 90, 77th Cong., 1st Sess., 87 Cong. Rec. 886, 899; H. Res. 420, 77th Cong., 2d Sess., 88 Cong. Rec. 2282, 2297; H. Res. 65, 78th Cong., 1st Sess., 89 Cong. Rec. 795, 810. See Note 15, *infra*.

[14] See, *e. g.*, H. Res. 510, 75th Cong., 3d Sess., 83 Cong. Rec. 8637, 8638 (1938); H. Res. 91, 77th Cong., 1st Sess., 87 Cong. Rec. 899 (1941); H. Res. 415, 78th Cong., 2d Sess., 90 Cong. Rec. 763 (1944); H. Res. 77, 80th Cong., 1st Sess., 93 Cong. Rec. 699, 700 (1947); H. Res. 152, 80th Cong., 1st Sess., 93 Cong. Rec. 3074 (1947); H. Res. 482, 81st Cong., 2d Sess., 96 Cong. Rec. 3941, 3944 (1950); H. Res. 119, 83d Cong., 1st Sess., 99 Cong. Rec. 1358–1359, 1361–1362 (1953); H. Res. 352, 84th Cong., 2d Sess., 102 Cong. Rec. 1585, 1718–1719 (1956); H. Res. 137, 86th Cong., 1st Sess., Cong. Rec., Jan. 29, 1959, p. 1286.

[15] H. Res. 5, 79th Cong., 1st Sess., 91 Cong. Rec. 10, 15. In 1946 the Committee's charter was embodied in the Legislative Reorganization Act of 1946, 60 Stat. 812, 828. Since then the House has continued the life of the Committee by making the charter provisions of the Act part of the House Rules for each new Congress. H. Res. 5, 80th Cong., 1st Sess., 93 Cong. Rec. 38; H. Res. 5, 81st Cong., 1st Sess., 95 Cong. Rec. 10, 11; H. Res. 7, 82d Cong., 1st Sess., 97 Cong. Rec. 9, 17, 19; H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 15, 18, 24; H. Res. 5, 84th Cong., 1st Sess., 101 Cong. Rec. 11; H. Res. 5, 85th Cong., 1st Sess., 103 Cong. Rec. 47; H. Res. 7, 86th Cong., 1st Sess., Cong. Rec., Jan. 7, 1959, p. 13.

compulsory process, was beyond the purview of the Committee's intended authority under Rule XI.

We are urged, however, to construe Rule XI so as at least to exclude the field of education from the Committee's compulsory authority. Two of the four dissenting judges below relied entirely, the other two alternatively, on this ground. 102 U. S. App. D. C., at 224, 226, 252 F. 2d, at 136, 138. The contention is premised on the course we took in *United States* v. *Rumely*, 345 U. S. 41, where in order to avoid constitutional issues we construed narrowly the authority of the congressional committee there involved. We cannot follow that route here, for this is not a case where Rule XI has to "speak for itself, since Congress put no gloss upon it at the time of its passage," nor one where the subsequent history of the Rule has the "infirmity of *post litem motam*, self-serving declarations." See *United States* v. *Rumely*, *supra*, at 44–45, 48.

To the contrary, the legislative gloss on Rule XI is again compelling. Not only is there no indication that the House ever viewed the field of education as being outside the Committee's authority under Rule XI, but the legislative history affirmatively evinces House approval of this phase of the Committee's work. During the first year of its activities, 1938, the Committee heard testimony on alleged Communist activities at Brooklyn College, N. Y.[16] The following year it conducted similar hearings relating to the American Student Union and the Teachers Union.[17] The field of "Communist influences in education" was one of the items contained in the Com-

[16] Hearings before House Special Committee on Un-American Activities on H. Res. 282, 75th Cong., 3d Sess. 943–973.

[17] Hearings before House Special Committee on Un-American Activities on H. Res. 282, 76th Cong., 1st Sess. 6827–6911.

mittee's 1947 program.[18] Other investigations including
education took place in 1952 and 1953.[19] And in 1953,
after the Committee had instituted the investigation in-
volved in this case, the desirability of investigating Com-
munism in education was specifically discussed during
consideration of its appropriation for that year, which
after controversial debate was approved.[20]

In this framework of the Committee's history we must
conclude that its legislative authority to conduct the
inquiry presently under consideration is unassailable, and
that independently of whatever bearing the broad scope
of Rule XI may have on the issue of "pertinency" in
a given investigation into Communist activities, as in
*Watkins,* the Rule cannot be said to be constitutionally

---

[18] See Note 11, *supra.*

[19] Defense area hearings at Detroit in 1952 involved inquiries into
Communist activities among the students and teachers in Michigan
schools and universities. H. R. Rep. No. 2516, 82d Cong., 2d Sess. 10.
Similar investigations were conducted by the Committee the same
year in the Chicago defense area. *Id.,* at 28. In 1953 the Com-
mittee investigated alleged Communist infiltration into the public
school systems in Philadelphia and New York, H. R. Rep. No. 1192,
83d Cong., 2d Sess. 2, 4.

[20] In the course of that debate a member of the Un-American
Activities Committee, Representative Jackson, commented: "So far
as education is concerned, if the American educators, and if the gen-
tlemen who are objecting to the investigation of communism and
Communists in education, will recognize a valid distinction, I want
to point out this is not a blunderbuss approach to the problem of
communism in education. We are not interested in textbooks. We
are not interested in the classroom operations of the universities.
We are interested instead in finding out who the Communists are
and what they are doing to further the Communist conspiracy. I may
say in that connection that we have sworn testimony identifying
individuals presently on the campuses of this country, men who have
been identified under cath as one-time members of the Communist
Party. Is there any Member of this body who would say we should
not investigate this situation?" 83d Cong., 1st Sess., 99 Cong. Rec.
1360.

infirm on the score of vagueness. The constitutional permissibility of that authority otherwise is a matter to be discussed later.

### PERTINENCY CLAIM.

Undeniably a conviction for contempt under 2 U. S. C. § 192 cannot stand unless the questions asked are pertinent to the subject matter of the investigation. *Watkins* v. *United States, supra,* at 214–215. But the factors which led us to rest decision on this ground in *Watkins* were very different from those involved here.

In *Watkins* the petitioner had made specific objection to the Subcommittee's questions on the ground of pertinency; the question under inquiry had not been disclosed in any illuminating manner; and the questions asked the petitioner were not only amorphous on their face, but in some instances clearly foreign to the alleged subject matter of the investigation—"Communism in labor." *Id.,* at 185, 209–215.

In contrast, petitioner in the case before us raised no objections on the ground of pertinency at the time any of the questions were put to him. It is true that the memorandum which petitioner brought with him to the Subcommittee hearing contained the statement, "to ask me whether I am or have been a member of the Communist Party may have dire consequences. I might wish to . . . challenge the pertinency of the question to the investigation," and at another point quoted from this Court's opinion in *Jones* v. *Securities & Exchange Comm'n,* 298 U. S. 1, language relating to a witness' right to be informed of the pertinency of questions asked him by an administrative agency.[21] These statements cannot,

---

[21] "The citizen, when interrogated about his private affairs, has a right before answering to know why the inquiry is made; and if the purpose disclosed is not a legitimate one, he may not be compelled to answer." 298 U. S., at 26.

however, be accepted as the equivalent of a pertinency objection. At best they constituted but a contemplated objection to questions still unasked, and buried as they were in the context of petitioner's general challenge to the power of the Subcommittee they can hardly be considered adequate, within the meaning of what was said in *Watkins, supra,* at 214–215, to trigger what would have been the Subcommittee's reciprocal obligation had it been faced with a pertinency objection.

We need not, however, rest decision on petitioner's failure to object on this score, for here "pertinency" was made to appear "with undisputable clarity." *Id.,* at 214. First of all, it goes without saying that the scope of the Committee's authority was for the House, not a witness, to determine, subject to the ultimate reviewing responsibility of this Court. What we deal with here is whether petitioner was sufficiently apprised of "the topic under inquiry" thus authorized "and the connective reasoning whereby the precise questions asked relate[d] to it." *Id.,* at 215. In light of his prepared memorandum of constitutional objections there can be no doubt that this petitioner was well aware of the Subcommittee's authority and purpose to question him as it did. See p. 123, *supra.* In addition the other sources of this information which we recognized in *Watkins, supra,* at 209–215, leave no room for a "pertinency" objection on this record. The subject matter of the inquiry had been identified at the commencement of the investigation as Communist infiltration into the field of education.[22] Just prior to petitioner's appearance before the Subcommittee, the scope of the day's hearings had been announced as "in the main communism in education and the experiences and background in the party by Francis X. T. Crowley.

---

[22] Excerpts from the Chairman's statement at the opening of the investigation on February 25, 1953, as to the nature of this inquiry are set forth in Note 31, *infra.*

It will deal with activities in Michigan, Boston, and in some small degree, New York." Petitioner had heard the Subcommittee interrogate the witness Crowley along the same lines as he, petitioner, was evidently to be questioned, and had listened to Crowley's testimony identifying him as a former member of an alleged Communist student organization at the University of Michigan while they both were in attendance there.[23] Further; petitioner had stood mute in the face of the Chairman's statement as to why he had been called as a witness by the Subcommittee.[24] And, lastly, unlike Watkins, *id.*, at 182–185, petitioner refused to answer questions as to his own Communist Party affiliations, whose pertinency of course was clear beyond doubt.

Petitioner's contentions on this aspect of the case cannot be sustained.

## CONSTITUTIONAL CONTENTIONS.

Our function, at this point, is purely one of constitutional adjudication in the particular case and upon the particular record before us, not to pass judgment upon the general wisdom or efficacy of the activities of this Committee in a vexing and complicated field.

---

[23] Crowley immediately preceded petitioner on the witness stand. It appears to be undisputed that petitioner was in the hearing room at the time this statement was made and during Crowley's testimony. In his own examination petitioner acknowledged knowing Crowley.

[24] The Chairman stated at the hearing, just before petitioner was excused,

"that the evidence or information contained in the files of this committee, some of them in the nature of evidence, shows clearly that the witness has information about Communist activities in the United States of America, particularly while he attended the University of Michigan.

"That information which the witness has would be very valuable to this committee and its work."

126

The precise constitutional issue confronting us is whether the Subcommittee's inquiry into petitioner's past or present membership in the Communist Party [25] transgressed the provisions of the First Amendment,[26] which of course reach and limit congressional investigations. *Watkins, supra,* at 197.

The Court's past cases establish sure guides to decision. Undeniably, the First Amendment in some circumstances protects an individual from being compelled to disclose his associational relationships. However, the protections of the First Amendment, unlike a proper claim of the privilege against self-incrimination under the Fifth Amendment, do not afford a witness the right to resist inquiry in all circumstances. Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown. These principles were recognized in the *Watkins* case, where, in speaking of the First Amendment in relation to congressional inquiries, we said (at p. 198): "It is manifest that despite the adverse effects which follow upon compelled disclosure of private matters, not all such inquiries are barred. . . . The critical element is the existence of,

---

[25] Because the sustaining of petitioner's conviction on any one of the five Counts of the indictment suffices for affirmance of the judgment under review, we state the constitutional issue only in terms of petitioner's refusals to answer the questions involved in Counts One and Two in order to sharpen discussion. However, we consider his refusal to answer the question embraced in Count Four would require the same constitutional result. As to Counts Three and Five, see p. 115, *supra.*

[26] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

and the weight to be ascribed to, the interest of the Congress in demanding disclosures from an unwilling witness." See also *American Communications Assn.* v. *Douds,* 339 U. S. 382, 399–400; *United States* v. *Rumely, supra,* at 43–44. More recently in *National Association for the Advancement of Colored People* v. *Alabama,* 357 U. S. 449, 463–466, we applied the same principles in judging state action claimed to infringe rights of association assured by the Due Process Clause of the Fourteenth Amendment, and stated that the " 'subordinating interest of the State must be compelling' " in order to overcome the individual constitutional rights at stake. See *Sweezy* v. *New Hampshire,* 354 U. S. 234, 255, 265 (concurring opinion). In light of these principles we now consider petitioner's First Amendment claims.

The first question is whether this investigation was related to a valid legislative purpose, for Congress may not constitutionally require an individual to disclose his political relationships or other private affairs except in relation to such a purpose. See *Watkins* v. *United States, supra,* at 198.

That Congress has wide power to legislate in the field of Communist activity in this Country, and to conduct appropriate investigations in aid thereof, is hardly debatable. The existence of such power has never been questioned by this Court, and it is sufficient to say, without particularization, that Congress has enacted or considered in this field a wide range of legislative measures, not a few of which have stemmed from recommendations of the very Committee whose actions have been drawn in question here.[27] In the last analysis this power rests on

---

[27] See, Legislative Recommendations by House Committee on Un-American Activities, Subsequent Action Taken by Congress or Executive Agencies (A Research Study by Legislative Reference Service of the Library of Congress), Committee on Un-American Activities, House of Representatives, 85th Cong., 2d Sess., June 1958.

the right of self-preservation, "the ultimate value of any society," *Dennis v. United States,* 341 U. S. 494, 509. Justification for its exercise in turn rests on the long and widely accepted view that the tenets of the Communist Party include the ultimate overthrow of the Government of the United States by force and violence, a view which has been given formal expression by the Congress.[28]

On these premises, this Court in its constitutional adjudications has consistently refused to view the Communist Party as an ordinary political party, and has upheld federal legislation aimed at the Communist problem which in a different context would certainly have raised constitutional issues of the gravest character. See, *e. g., Carlson v. Landon,* 342 U. S. 524; *Galvan v. Press,* 347 U. S. 522. On the same premises this Court has upheld under the Fourteenth Amendment state legislation requiring those occupying or seeking public office to disclaim knowing membership in any organization advocating overthrow of the Government by force and violence, which legislation none can avoid seeing was aimed at membership in the Communist Party. See *Gerende v. Board of Supervisors,* 341 U. S. 56; *Garner v. Board of Public Works,* 341 U. S. 716. See also *Beilan v. Board of Public Education,* 357 U. S. 399; *Lerner v. Casey,* 357 U. S. 468; *Adler v. Board of Education,* 342 U. S. 485. Similarly, in other areas, this Court has recognized the close nexus between the Communist Party and violent overthrow of government. See *Dennis v. United States, supra; American Communications Assn. v. Douds, supra.* To suggest that because the Communist Party may also sponsor peaceable political reforms the constitutional issues before us should now be judged as if that Party were just an ordinary polit-

---

[28] See, Subversive Activities Control Act of 1950, Title I of the Internal Security Act of 1950, § 2, 64 Stat. 987–989. See also *Carlson v. Landon,* 342 U. S. 524, 535, n. 21.

ical party from the standpoint of national security, is to ask this Court to blind itself to world affairs which have determined the whole course of our national policy since the close of World War II, affairs to which Judge Learned Hand gave vivid expression in his opinion in *United States* v. *Dennis,* 183 F. 2d 201, 213, and to the vast burdens which these conditions have entailed for the entire Nation.

We think that investigatory power in this domain is not to be denied Congress solely because the field of education is involved. Nothing in the prevailing opinions in *Sweezy* v. *New Hampshire, supra,* stands for a contrary view. The vice existing there was that the questioning of Sweezy, who had not been shown ever to have been connected with the Communist Party, as to the contents of a lecture he had given at the University of New Hampshire, and as to his connections with the Progressive Party, then on the ballot as a normal political party in some 26 States, was too far removed from the premises on which the constitutionality of the State's investigation had to depend to withstand attack under the Fourteenth Amendment. See the concurring opinion in *Sweezy, supra,* at 261, 265, 266, n. 3. This is a very different thing from inquiring into the extent to which the Communist Party has succeeded in infiltrating into our universities, or elsewhere, persons and groups committed to furthering the objective of overthrow. See Note 20, *supra.* Indeed we do not understand petitioner here to suggest that Congress in no circumstances may inquire into Communist activity in the field of education.[29]

---

[29] The *amicus* brief of the American Association of University Professors states at page 24: "The claims of academic freedom cannot be asserted unqualifiedly. The social interest it embodies is but one of a larger set, within which the interest in national self-preservation and in enlightened and well-informed law-making also prominently appear. When two major interests collide, as they do in the present

Rather, his position is in effect that this particular investigation was aimed not at the revolutionary aspects but at the theoretical classroom discussion of communism.

In our opinion this position rests on a too constricted view of the nature of the investigatory process, and is not supported by a fair assessment of the record before us. An investigation of advocacy of or preparation for overthrow certainly embraces the right to identify a witness as a member of the Communist Party, see *Barsky* v. *United States,* 83 U. S. App. D. C. 127, 167 F. 2d 241, and to inquire into the various manifestations of the Party's tenets. The strict requirements of a prosecution under the Smith Act,[30] see *Dennis* v. *United States, supra,* and *Yates* v. *United States,* 354 U. S. 298, are not the measure of the permissible scope of a congressional investigation into "overthrow," for of necessity the investigatory process must proceed step by step. Nor can it fairly be concluded that this investigation was directed at controlling what is being taught at our universities rather than at overthrow. The statement of the Subcommittee Chairman at the opening of the investigation evinces no such intention,[31] and so far as this record re-

---

case, neither the one nor the other can claim *a priori* supremacy. But it is in the nature of our system of laws that there must be demonstrable justification for an action by the Government which endangers or denies a freedom guaranteed by the Constitution."

[30] 54 Stat. 670, 18 U. S. C. § 2385.

[31] The following are excerpts from that statement:

". . . In opening this hearing, it is well to make clear to you and others just what the nature of this investigation is.

"From time to time, the committee has investigated Communists and Communist activities within the entertainment, newspaper, and labor fields, and also within the professions and the Government. In no instance has the work of the committee taken on the character of an investigation of entertainment organizations, newspapers, labor unions, the professions, or the Government, as such, and it is not

veals nothing thereafter transpired which would justify our holding that the thrust of the investigation later changed. The record discloses considerable testimony concerning the foreign domination and revolutionary

now the purpose of this committee to investigate education or educational institutions; as such. . . .

"The purpose of the committee in investigating Communists and Communist-activities within the field of education is no greater and no less than its purpose in investigating Communists and Communist activities within the field of labor or any other field.

"The committee is charged by the Congress with the responsibility of investigating the extent, character, and objects of un-American propaganda activities in the United States, the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution and all other questions in relation thereto that would aid Congress in any necessary remedial legislation.

"It has been fully established in testimony before congressional committees and before the courts of our land that the Communist Party of the United States is part of an international conspiracy which is being used as a tool or weapon by a foreign power to promote its own foreign policy and which has for its object the overthrow of the governments of all non-Communist countries, resorting to the use of force and violence, if necessary. . . . Communism and Communist activities cannot be investigated in a vacuum. The investigation must, of necessity, relate to individuals and, therefore, this morning the committee is calling you [one, Davis] as a person known by this committee to have been at one time a member of the Communist Party.

"The committee is equally concerned with the opportunities that the Communist Party has to wield its influence upon members of the teaching profession and students through Communists who are members of the teaching profession. Therefore, the objective of this investigation is to ascertain the character, extent and objects of Communist Party activities when such activities are carried on by members of the teaching profession who are subject to the directives and discipline of the Communist Party." The full statement is printed as the Appendix to the original Court of Appeals opinion, 100 U/S. App. D. C. 22–24, 240 F. 2d 884–886.

purposes and efforts of the Communist Party.[32] That there was also testimony on the abstract philosophical level does not detract from the dominant theme of this investigation—Communist infiltration furthering the alleged ultimate purpose of overthrow. And certainly the conclusion would not be justified that the questioning of petitioner would have exceeded permissible bounds had he not shut off the Subcommittee at the threshold.

Nor can we accept the further contention that this investigation should not be deemed to have been in furtherance of a legislative purpose because the true objective of the Committee and of the Congress was purely "exposure." So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power. *Arizona* v. *California,* 283 U. S. 423, 455, and cases there cited. "It is, of course, true," as was said in *McCray* v. *United States,* 195 U. S. 27, 55, "that if there be no authority in the judiciary to restrain a lawful exercise of power by another department of the government, where a wrong motive or purpose has impelled to the exertion of the power, that abuses of a power conferred may be temporarily effectual. The

---

[32] Thus, early in the investigation one of the witnesses, Hicks, testified in response to a question as to "the general purpose of the Communist Party in endeavoring to organize a cell or unit among the teaching profession" at the various universities that contrary to his original view:

". . . it is very obvious to me that the popular front [Communist protection of democracy against Fascism] was simply a dodge that happened in those particular years to serve the foreign policy of the Soviet Union; so it seems to me that the party, in organizing branches in the colleges, had two purposes. One was to carry out the existing line which they wanted to make a show of advancing, and then, of course, the other was to try to have a corps of disciplined revolutionaries whom they could use for other purposes when the time came."

remedy for this, however, lies, not in the abuse by the judicial authority of its functions, but in the people, upon whom, after all, under our institutions, reliance must be placed for the correction of abuses committed in the exercise of a lawful power." These principles of course apply as well to committee investigations into the need for legislation as to the enactments which such investigations may produce. Cf. *Tenney* v. *Brandhove*, 341 U. S. 367, 377–378. Thus, in stating in the *Watkins* case, p. 200, that "there is no congressional power to expose for the sake of exposure," we at the same time declined to inquire into the "motives of committee members," and recognized that their "motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." Having scrutinized this record we cannot say that the unanimous panel of the Court of Appeals which first considered this case was wrong in concluding that "the primary purposes of the inquiry were in aid of legislative processes." 240 F. 2d, at 881.[33] Certainly this is not a case like *Kilbourn* v. *Thompson*, 103 U. S. 168, 192, where "the House of Representatives not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial." See *McGrain* v. *Daugherty*, 273 U. S. 135, 171. The constitutional legislative power of Congress in this instance is beyond question.

---

[33] We agree with the Court of Appeals that the one sentence appearing in the Committee's report for 1954, upon which petitioner largely predicates his exposure argument, bears little significance when read in the context of the full report and in light of the entire record. This sentence reads: "The 1954 hearings were set up by the committee in order to demonstrate to the people of Michigan the fields of concentration of the Communist Party in the Michigan area, and the identity of those individuals responsible for its success."

Finally, the record is barren of other factors which in themselves might sometimes lead to the conclusion that the individual interests at stake were not subordinate to those of the state. There is no indication in this record that the Subcommittee was attempting to pillory witnesses. Nor did petitioner's appearance as a witness follow from indiscriminate dragnet procedures, lacking in probable cause for belief that he possessed information which might be helpful to the Subcommittee.[34] And the relevancy of the questions put to him by the Subcommittee is not open to doubt.

We conclude that the balance between the individual and the governmental interests here at stake must be struck in favor of the latter, and that therefore the provisions of the First Amendment have not been offended.

We hold that petitioner's conviction for contempt of Congress discloses no infirmity, and that the judgment of the Court of Appeals must be

*Affirmed.*

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

On May 28, 1954, petitioner Lloyd Barenblatt, then 31 years old, and a teacher of psychology at Vassar College, was summoned to appear before a Subcommittee of the House Committee on Un-American Activities. After service of the summons, but before Barenblatt appeared on June 28, his four-year contract with Vassar expired and was not renewed. He, therefore, came to the Committee as a private citizen without a job. Earlier that day, the Committee's interest in Barenblatt had been aroused by the testimony of an ex-Communist named Crowley. When Crowley had first appeared before the Un-American Activities Committee he had steadfastly

---

[34] See p. 124 and Note 24, *supra.*

refused to admit or deny Communist affiliations or to identify others as Communists. After the House reported this refusal to the United States Attorney for prosecution, Crowley "voluntarily" returned and asked to testify. He was sworn in and interrogated, but not before he was made aware by various Committee members of Committee policy to "make an appropriate recommendation" to protect any witness who "fully cooperates with the committee." He then talked at length, identifying by name, address and occupation, whenever possible, people he claimed had been Communists. One of these was Barenblatt, who, according to Crowley, had been a Communist during 1947–1950 while a graduate student and teaching fellow at the University of Michigan. Though Crowley testified in great detail about the small group of Communists who had been at Michigan at that time and though the Committee was very satisfied with his testimony, it sought repetition of much of the information from Barenblatt. Barenblatt, however, refused to answer their questions and filed a long statement outlining his constitutional objections. He asserted that the Committee was violating the Constitution by abridging freedom of speech, thought, press, and association, and by conducting legislative trials of known or suspected Communists which trespassed on the exclusive power of the judiciary. He argued that however he answered questions relating to membership in the Communist Party his position in society and his ability to earn a living would be seriously jeopardized; that he would, in effect, be subjected to a bill of attainder despite the twice-expressed constitutional mandate against such legislative punishments.[1] This would occur, he pointed out, even

---

[1] Bills of attainder are among the few measures explicitly forbidden to both State and Federal Governments by the body of the Constitution itself. U. S. Const., Art. I, § 9, cl. 3, states "No Bill of

if he did no more than invoke the protection of clearly applicable provisions of the Bill of Rights as a reason for refusing to answer.

He repeated these, and other objections, in the District Court as a reason for dismissing an indictment for contempt of Congress. His position, however, was rejected at the trial and in the Court of Appeals for the District of Columbia Circuit over the strong dissents of Chief Judge Edgerton and Judges Bazelon, Fahy and Washington. The Court today affirms, and thereby sanctions the use of the contempt power to enforce questioning by congressional committees in the realm of speech and association. I cannot agree with this disposition of the case for I believe that the resolution establishing the House Un-American Activities Committee and the questions that Committee asked Barenblatt violate the Constitution in several respects. (1) Rule XI creating the Committee authorizes such a sweeping, unlimited, all-inclusive and undiscriminating compulsory examination of witnesses in the field of speech, press, petition and assembly that it violates the procedural requirements of the Due Process Clause of the Fifth Amendment. (2) Compelling an answer to the questions asked Barenblatt abridges freedom of speech and association in contravention of the First Amendment. (3) The Committee proceedings were part of a legislative program to stigmatize and punish by public identification and exposure all witnesses considered by the Committee to be guilty of Communist affiliations, as well as all witnesses who refused to answer Committee questions on constitutional grounds; the Committee was thus improperly seeking to try, convict, and punish suspects, a task which the Constitution expressly denies to Congress and grants exclu-

---

Attainder or ex post facto Law shall be passed." U. S. Const., Art. I, § 10, cl. 1, reads in part "No State shall . . . pass any Bill of Attainder [or] ex post facto Law . . . ."

sively to the courts, to be exercised by them only after indictment and in full compliance with all the safeguards provided by the Bill of Rights.

## I.

It goes without saying that a law to be valid must be clear enough to make its commands understandable. For obvious reasons, the standard of certainty required in criminal statutes is more exacting than in noncriminal statutes.[2] This is simply because it would be unthinkable to convict a man for violating a law he could not understand. This Court has recognized that the stricter standard is as much required in criminal contempt cases as in all other criminal cases,[3] and has emphasized that the "vice of vagueness" is especially pernicious where legislative power over an area involving speech, press, petition and assembly is involved.[4] In this area the statement that a statute is void if it "attempts to cover so much that it effectively covers nothing," see *Musser* v. *Utah*, 333 U. S. 95, 97, takes on double significance. For a statute broad enough to support infringement of speech, writings, thoughts and public assemblies, against the unequivocal command of the First Amendment necessarily leaves all persons to guess just what the law really means to cover, and fear of a wrong guess inevitably leads people to forego the very rights the Constitution sought to protect above all others.[5] Vagueness becomes

---

[2] *E. g., Lanzetta* v. *New Jersey*, 306 U. S. 451; *Winters* v. *New York*, 333 U. S. 507, 515; *Jordan* v. *De George*, 341 U. S. 223, 230–231.

[3] *E. g., Watkins* v. *United States*, 354 U. S. 178, 207–208; *Flaxer* v. *United States*, 358 U. S. 147; *Scull* v. *Virginia*, 359 U. S. 344.

[4] See, e: g., *Herndon* v. *Lowry*, 301 U. S. 242; *Winters* v. *New York*, 333 U. S. 507; *Watkins* v. *United States*, 354 U. S. 178; *Scull* v. *Virginia*, 359 U. S. 344.

[5] *Thornhill* v. *Alabama*, 310 U. S. 88, 97–98. Cf. *Herndon* v. *Lowry*, 301 U. S. 242.

even more intolerable in this area if one accepts, as the Court today does, a balancing test to decide if First Amendment rights shall be protected. It is difficult at best to make a man guess—at the penalty of imprisonment—whether a court will consider the State's need for certain information superior to society's interest in unfettered freedom. It is unconscionable to make him choose between the right to keep silent and the need to speak when the statute supposedly establishing the "state's interest" is too vague to give him guidance. Cf. *Scull* v. *Virginia,* 359 U. S. 344.

Measured by the foregoing standards, Rule XI cannot support any conviction for refusal to testify. In substance it authorizes the Committee to compel witnesses to give evidence about all "un-American propaganda," whether instigated in this country or abroad.[6] The word "propaganda" seems to mean anything that people say, write, think or associate together about. The term "un-American" is equally vague. As was said in *Watkins* v. *United States,* 354 U. S. 178, 202, "Who can define [its] meaning . . . ? What is that single, solitary 'principle of the form of government as guaranteed by our Constitution'?" I think it clear that the boundaries of the Committee are, to say the least, "nebulous." Indeed, "It would be difficult to imagine a less explicit authorizing resolution." *Ibid.*

---

[6] Rule XI in relevant part reads, "The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." H. Res. 5, 83d Cong., 1st Sess., 99 Cong. Rec. 15, 18, 24. See also H. Res. 7, 86th Cong., 1st Sess., Cong. Rec., Jan. 7, 1959, p. 13.

The Court—while not denying the vagueness of Rule XI—nevertheless defends its application here because the questions asked concerned communism, a subject of investigation which had been reported to the House by the Committee on numerous occasions. If the issue were merely whether Congress intended to allow an investigation of communism, or even of communism in education, it may well be that we could hold the data cited by the Court sufficient to support a finding of intent. But that is expressly not the issue. On the Court's own test, the issue is whether Barenblatt can know with sufficient certainty, at the time of his interrogation, that there is so compelling a need for his replies that infringement of his rights of free association is justified. The record does not disclose where Barenblatt can find what that need is. There is certainly no clear congressional statement of it in Rule XI. Perhaps if Barenblatt had had time to read all the reports of the Committee to the House, and in addition had examined the appropriations made to the Committee he, like the Court, could have discerned an intent by Congress to allow an investigation of communism in education. Even so he would be hard put to decide what the need for this investigation is since Congress expressed it neither when it enacted Rule XI nor when it acquiesced in the Committee's assertions of power. Yet it is knowledge of this need—what is wanted from him and why it is wanted—that a witness must have if he is to be in a position to comply with the Court's rule that he balance individual rights against the requirements of the State. I cannot see how that knowledge can exist under Rule XI.

But even if Barenblatt could evaluate the importance to the Government of the information sought, Rule XI would still be too broad to support his conviction. For we are dealing here with governmental procedures which the Court itself admits reach to the very fringes of con-

gressional power. In such cases more is required of legislatures than a vague delegation to be filled in later by mute acquiescence.[7] If Congress wants ideas investigated, if it even wants them investigated in the field of education, it must be prepared to say so expressly and unequivocally. And it is not enough that a court through exhaustive research can establish, even conclusively, that Congress wished to allow the investigation. I can find no such unequivocal statement here.

For all these reasons, I would hold that Rule XI is too broad to be meaningful and cannot support petitioner's conviction.[8]

## II.

The First Amendment says in no equivocal language that Congress shall pass no law abridging freedom of speech, press, assembly or petition.[9] The activities of

---

[7] See, e. g., Panama Refining Co. v. Ryan, 293 U. S. 388; Schechter Poultry Corp. v. United States, 295 U. S. 495; id., at 551 (concurring opinion); Berra v. United States, 351 U. S. 131, 135 (dissenting opinion); Watkins v. United States, 354 U. S. 178, 203–205; Sweezy v. New Hampshire, 354 U. S. 234. Cf. United States v. Rumely, 345 U. S. 41; Kent v. Dulles, 357 U. S. 116. These cases show that when this Court considered that the legislative measures involved were of doubtful constitutionality substantively, it required explicit delegations of power.

[8] It is of course no answer to Barenblatt's claim that Rule XI is too vague, to say that if it had been too vague it would have been so held in Watkins v. United States, 354 U. S. 178. It would be a strange rule, indeed, which would imply the invalidity of a broad ground of decision from the fact that this Court decided an earlier case on a narrower basis.

[9] The First Amendment reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." There can be no doubt that the same Amendment protects the right to keep silent. See West

this Committee, authorized by Congress, do precisely that, through exposure, obloquy and public scorn. See *Watkins* v. *United States,* 354 U. S. 178, 197–198. The Court does not really deny this fact but relies on a combination of three reasons for permitting the infringement: (A) The notion that despite the First Amendment's command Congress can abridge speech and association if this Court decides that the governmental interest in abridging speech is greater than an individual's interest in exercising that freedom, (B) the Government's right to "preserve itself," (C) the fact that the Committee is only after Communists or suspected Communists in this investigation.

(A) I do not agree that laws directly abridging First Amendment freedoms can be justified by a congressional or judicial balancing process. There are, of course, cases suggesting that a law which primarily regulates conduct but which might also indirectly affect speech can be upheld if the effect on speech is minor in relation to the need for control of the conduct. With these cases I agree. Typical of them are *Cantwell* v. *Connecticut,* 310 U. S. 296, and *Schneider* v. *Irvington,* 308 U. S. 147. Both of these involved the right of a city to control its streets. In *Cantwell,* a man had been convicted of breach of the peace for playing a phonograph on the street. He defended on the ground that he was disseminating religious views and could not, therefore, be stopped. We upheld his defense, but in so doing we pointed out that the city did have substantial power over conduct on the streets even where this power might to some extent affect speech. A State, we said, might "by general and non-discriminatory legislation

Virginia Board of Education v. Barnette, 319 U. S. 624; N. A. A. C. P. v. Alabama, 357 U. S. 449, 460–466; Sweezy v. New Hampshire, 354 U. S. 234, 255 (concurring opinion); Watkins v. United States, 354 U. S. 178; Scull v. Virginia, 359 U. S. 344. Cf. United States v. Rumely, 345 U. S. 41.

regulate the times, the places, and the manner of soliciting upon its streets and holding meetings thereon." 310 U. S., at 304. But even such laws governing conduct, we emphasized, must be tested, though only by a balancing process, if they indirectly affect ideas. On one side of the balance, we pointed out, is the interest of the United States in seeing that its fundamental law protecting freedom of communication is not abridged; on the other the obvious interest of the State to regulate conduct within its boundaries. In *Cantwell* we held that the need to control the streets could not justify the restriction made on speech. We stressed the fact that where a man had a right to be on a street, "he had a right peacefully to impart his views to others." 310 U. S., at 308. Similar views were expressed in *Schneider,* which concerned ordinances prohibiting the distribution of handbills to prevent littering. We forbade application of such ordinances when they affected literature designed to spread ideas. There were other ways, we said, to protect the city from littering which would not sacrifice the right of the people to be informed. In so holding, we, of course, found it necessary to "weigh the circumstances." 308 U. S., at 161. But we did not in *Schneider,* any more than in *Cantwell,* even remotely suggest that a law directly aimed at curtailing speech and political persuasion could be saved through a balancing process. Neither these cases, nor any others, can be read as allowing legislative bodies to pass laws abridging freedom of speech, press and association merely because of hostility to views peacefully expressed in a place where the speaker had a right to be. Rule XI, on its face and as here applied, since it attempts inquiry into beliefs, not action—ideas and associations, not conduct—does just that.[10]

---

[10] I do not understand the Court's opinion in *Watkins* v. *United States,* 354 U. S. 178, 198, to approve the type of balancing process adopted in the Court's opinion here. We did discuss in that case

.To apply the Court's balancing test under such circumstances is to read the First Amendment to say "Congress shall pass no law abridging freedom of speech, press, assembly and petition, unless Congress and the Supreme Court reach the joint conclusion that on balance the interest of the Government in stifling these freedoms is greater than the interest of the people in having them exercised." This is closely akin to the notion that neither the First Amendment nor any other provision of the Bill of Rights should be enforced unless the Court believes it is *reasonable* to do so. Not only does this violate the genius of our *written* Constitution, but it runs expressly counter to the injunction to Court and Congress made by Madison when he introduced the Bill of Rights. "If they [the first ten amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against *every* assumption of power in the Legislative or Executive; they will be naturally led to resist *every* encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." [11] Unless we return to this view of our judicial function, unless we once again accept the notion that the Bill of Rights means what it

"the weight to be ascribed to . . . the interest of the Congress in demanding disclosures from an unwilling witness." As I read, and still read, the Court's discussion of this problem in *Watkins* it was referring to the problems raised by *Kilbourn* v. *Thompson*, 103 U. S. 168, which held that legislative committees could not make roving inquiries into the private business affairs of witnesses. The Court, in *Kilbourn*, held that the courts must be careful to insure that, on balance, Congress did not unjustifiably encroach on an individual's private business affairs. Needless to say, an individual's right to silence in such matters is quite a different thing from the public's interest in freedom of speech and the test applicable to one has little, if anything, to do with the test applicable to the other.

[11] 1 Annals of Cong. 439 (1789). (Italics supplied.)

says and that this Court must enforce that meaning, I am of the opinion that our great charter of liberty will be more honored in the breach than in the observance.

But even assuming what I cannot assume, that some balancing is proper in this case, I feel that the Court after stating the test ignores it completely. At most it balances the right of the Government to preserve itself, against Barenblatt's right to refrain from revealing Communist affiliations. Such a balance, however, mistakes the factors to be weighed. In the first place, it completely leaves out the real interest in Barenblatt's silence, the interest of the people as a whole in being able to join organizations, advocate causes and make political "mistakes" without later being subjected to governmental penalties for having dared to think for themselves. It is this right, the right to err politically, which keeps us strong as a Nation. For no number of laws against communism can have as much effect as the personal conviction which comes from having heard its arguments and rejected them, or from having once accepted its tenets and later recognized their worthlessness. Instead, the obloquy which results from investigations such as this not only stifles "mistakes" but prevents all but the most courageous from hazarding any views which might at some later time become disfavored. This result, whose importance cannot be overestimated, is doubly crucial when it affects the universities, on which we must largely rely for the experimentation and development of new ideas essential to our country's welfare. It is these interests of society, rather than Barenblatt's own right to silence, which I think the Court should put on the balance against the demands of the Government, if any balancing process is to be tolerated. Instead they are not mentioned, while on the other-side the demands of the Government are vastly overstated and called "self preservation." It is admitted that this Committee can only seek

information for the purpose of suggesting laws, and that Congress' power to make laws in the realm of speech and association is quite limited, even on the Court's test. Its interest in making such laws in the field of education, primarily a state function, is clearly narrower still. Yet the Court styles this attenuated interest self-preservation and allows it to overcome the need our country has to let us all think, speak, and associate politically as we like and without fear of reprisal. Such a result reduces "balancing" to a mere play on words and is completely inconsistent with the rules this Court has previously given for applying a "balancing test," where it is proper: "[T]he courts should be *astute* to examine the *effect* of the challenged legislation. Mere *legislative preferences or beliefs* . . . may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions." *Schneider* v. *Irvington,* 308 U. S. 147, 161. (Italics supplied.)

(B) Moreover, I cannot agree with the Court's notion that First Amendment freedoms must be abridged in order to "preserve" our country. That notion rests on the unarticulated premise that this Nation's security hangs upon its power to punish people because of what they think, speak or write about, or because of those with whom they associate for political purposes. The Government, in its brief, virtually admits this position when it speaks of the "communication of unlawful ideas." I challenge this premise, and deny that ideas can be proscribed under our Constitution. I agree that despotic governments cannot exist without stifling the voice of opposition to their oppressive practices. The First Amendment means to me, however, that the only constitutional way our Government can preserve itself is to leave its people the fullest possible freedom to praise, criticize or discuss, as they see fit, all governmental policies and to suggest, if they desire,

that even its most fundamental postulates are bad and should be changed; "Therein lies the security of the Republic, the very foundation of constitutional government."[12] On that premise this land was created, and on that premise it has grown to greatness. Our Constitution assumes that the common sense of the people and their attachment to our country will enable them, after free discussion, to withstand ideas that are wrong. To say that our patriotism must be protected against false ideas by means other than these is, I think, to make a baseless charge. Unless we can rely on these qualities—if, in short, we begin to punish speech—we cannot honestly proclaim ourselves to be a free Nation and we have lost what the Founders of this land risked their lives and their sacred honor to defend.

(C) The Court implies, however, that the ordinary rules and requirements of the Constitution do not apply because the Committee is merely after Communists and they do not constitute a political party but only a criminal gang. "[T]he long and widely accepted view," the Court says, is "that the tenets of the Communist Party include the ultimate overthrow of the Government of the United States by force and violence." [13] This justifies the

---

[12] "The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." *De Jonge* v. *Oregon,* 299 U. S. 353, 365.

[13] Cf. statement of Sir Richard Nagle presenting a bill of attainder against between two and three thousand persons for political offenses, " 'Many of the' persons here attainted,' said he, 'have been proved traitors by such evidence as satisfies us. As to the rest we have followed common fame.' " Cited in *Joint Anti-Fascist Committee* v. *McGrath,* 341 U. S. 123, 142, 148 (concurring opinion).

investigation undertaken. . By accepting this charge and allowing it to support treatment of the Communist Party and its members which would violate the Constitution if appli ;d to other groups, the Court, in effect, declares that Part ' outlawed. It has been only a few years since there was a practically unanimous feeling throughout the country and in our courts that this could not be done in our free land. Of course it has always been recognized that members of the Party who, either individually or in combination, commit acts in violation of valid laws can be prosecuted. But the Party as a whole and innocent members of it could not be attainted merely because it had some illegal aims and because some of its members were lawbreakers. Thus in, *De Jonge* v. *Oregon*, 299 U. S. 353, 357 (1937), on stipulated facts that the Communist Party advocated criminal syndicalism—"crime, physical violence, sabotage or any unlawful acts or methods as a means of accomplishing or effecting industrial or political change or revolution"—a unanimous Court, speaking through Chief Justice Hughes, held that a Communist addressing a Communist rally could be found guilty of no offense so long as no violence or crime was urged at the meeting. . The Court absolutely refused to concede that either De Jonge or the Communist Party forfeited the protections of the First and Fourteenth Amendments because one of the Party's purposes was to effect a violent change of government. See also *Herndon* v. *Lowry*, 301 U. S. 242.

Later, in 1948, when various bills were proposed in the House and Senate to handicap or outlaw the Communist Party, leaders of the Bar who had been asked to give their views rose up to contest the constitutionality of the measures. The late Charles Evans Hughes, Jr., questioned the validity under both the First and Fifth Amendments of one of these bills, which in effect outlawed the Party. The late John W. Davis attacked it

as lacking an ascertainable standard of guilt under many of this Court's cases.[14] And the Attorney General of the United States not only indicated that such a measure would be unconstitutional but declared it to be unwise even if valid. He buttressed his position by citing a statement by J. Edgar Hoover, Director of the Federal Bureau of Investigation, and the declaration of this Court in *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 642, that:

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." [15]

Even the proponent of the bill disclaimed any aim to outlaw the Communist Party and pointed out the "disadvantages" of such a move by stating that "the Communist Party was illegal and outlawed in Russia when it took over control of the Soviet Union." [16] Again, when the

---

[14] See Hearings, Senate Committee on the Judiciary on H. R. 5852, 80th Cong., 2d Sess. 415–420, 420–422.

[15] *Id.,* at 422–425. See also Hearings, Subcommittee on Legislation of the House Committee on Un-American Activities on H. R. 4422, H. R. 4581, 80th Cong., 2d Sess. 16–37.

[16] Hearings, Subcommittee on Legislation of the Committee on Un-American Activities on H. R. 4422, H. R. 4581, 80th Cong., 2d Sess. 13. This statement was relied on by the Honorable Thomas E. Dewey, then a candidate for the presidency of the United States, in a speech given in Portland, Oregon, in May, 1948. Mr. Dewey went on to say, in opposing outlawry of the Communist Party:

"I am against it because it is a violation of the Constitution of the United States and of the Bill of Rights, and clearly so. I am against it because it is immoral and nothing but totalitarianism itself. I am against it because I know from a great many years' experience in the enforcement of the law that the proposal wouldn't

Attorney General testified on a proposal to bar the Communist Party from the ballot he said, "an organized group, whether you call it political or not, could hardly be barred from the ballot without jeopardizing the constitutional guarantees of all other political groups and parties." [17]

All these statements indicate quite clearly that no matter how often or how quickly we repeat the claim that the Communist Party is not a political party, we cannot outlaw it, as a group, without endangering the liberty of all of us. The reason is not hard to find, for mixed among those aims of communism which are illegal are perfectly normal political and social goals. And muddled with its revolutionary tenets is a drive to achieve power through the ballot, if it can be done. These things necessarily make it a political party whatever other, illegal, aims it may have. Cf. *Gerende* v. *Board of Supervisors*, 341 U. S. 56. Significantly until recently the Communist Party was on the ballot in many States. When that was so, many Communists undoubtedly hoped to accomplish

work, and instead it would rapidly advance the cause of communism in the United States and all over the world.

"There is an American way to do this job, a perfectly simple American way . . . outlawing every conceivable *act* of subversion against the United States. . . .

"Now, times are too grave to try any expedients and fail. This expedient has failed, this expedient of outlawing has failed in Russia. It failed in Europe, it failed in Italy, it failed in Canada. . . .

"Let us not make such a terrific blunder in the United States . . . . Let us go forward as Free Americans. Let us have the courage to be free." XIV Vital Speeches of the Day, 486–487. (Italics supplied.)

[17] Hearings, Subcommittee on Legislation of the Committee on Un-American Activities on H. R. 4422, H. R. 4581, 80th Cong., 2d Sess. 20. Compare statement of John Lilburne, "what is done unto any one, may be done unto every one." Note 39, *infra*.

its lawful goals through support of Communist candidates. Even now some such may still remain.[18] To attribute to them, and to those who have left the Party, the taint of the group is to ignore both our traditions that guilt like belief is "personal and not a matter of mere association" and the obvious fact that "men adhering to a political party or other organization notoriously do not subscribe unqualifiedly to all of its platforms or asserted principles." *Schneiderman* v. *United States,* 320 U. S. 118, 136. See also *Dennis* v. *United States,* 341 U. S. 494, 579, 581 (dissenting opinions).

The fact is that once we allow any group which has some political aims or ideas to be driven from the ballot and from the battle for men's minds because some of its members are bad and some of its tenets are illegal, no group is safe. Today we deal with Communists or suspected Communists. In 1920, instead, the New York Assembly suspended duly elected legislators on the ground that, being Socialists, they were disloyal to the country's principles.[19] In the 1830's the Masons were hunted as outlaws and subversives, and abolitionists were considered revolutionaries of the most dangerous kind in both North and South.[20] Earlier still, at the time of the uni-

---

[18] S. Doc. No. 97, 85th Cong., 2d Sess. 149, lists the States with laws relating to the Communist Party and the ballot. See also, Fund For The Republic, Digest of the Public Record of Communism in the United States, 324–343. For a discussion of state laws requiring a minimum percentage of the votes cast to remain on the ballot, see Note, 57 Yale L. J. 1276.

[19] See O'Brian, Loyalty Tests and Guilt by Association, 61 Harv. L. Rev. 592, 593. Significantly the action of the New York Assembly was strongly condemned by Charles Evans Hughes, then a former Associate Justice of this Court, and later its Chief Justice.

[20] See generally, McCarthy, The Antimasonic Party: A Study of Political Antimasonry in the United States, 1827–1840. H. R. Doc. No. 461, 57th Cong., 2d Sess. 365. Nye, William Lloyd Garrison, 88–105; Korngold, Two Friends of Man, 82–104. Cf. St. George

versally unlamented alien and sedition laws, Thomas
Jefferson's party was attacked and its members were
derisively called "Jacobins." Fisher Ames described the
party as a "French faction" guilty of "subversion" and
"officered, regimented and formed to subordination."
Its members, he claimed, intended to "take arms against
the laws as soon as they dare." [21] History should teach
us then, that in times of high emotional excitement
minority parties and groups which advocate extremely
unpopular social or governmental innovations will always
be typed as criminal gangs and attempts will always be
made to drive them out.[22] It was knowledge of this fact,
and of its great dangers, that caused the Founders of our
land to enact the First Amendment as a guarantee that
neither Congress nor the people would do anything to
hinder or destroy the capacity of individuals and groups
to seek converts and votes for any cause, however radical
or unpalatable their principles might seem under the
accepted notions of the time. Whatever the States were
left free to do, the First Amendment sought to leave Con-
gress devoid of any kind or quality of power to direct any
type of national laws against the freedom of individuals
to think what they please, advocate whatever policy they
choose, and join with others to bring about the social,
religious, political and governmental changes which seem
best to them.[23] Today's holding, in my judgment, marks

Tucker, Appendix, 1 Blackstone (Tucker ed. 1803) 315, discussing
English laws "for suppressing assemblies of free-masons" and pointing
out that similar laws cannot be enacted under our Constitution.

[21] Ames, Laocoon, printed in Works of Fisher Ames (1809 ed.),
94, 97, 101, 106. See also *American Communications Assn.* v. *Douds,*
339 U. S. 382, 445 (dissenting opinion).

[22] Cf. Mill, On Liberty (1885 ed.), 30 (criticizing laws restricting
the right to advocate tyrannicide).

[23] Cf. St. George Tucker, Appendix, 1 Blackstone Commentaries
(Tucker ed. 1803) 299. "[T]he judicial courts of the respective states
are open to all persons alike, for the redress of injuries of this nature

another major step in the progressively increasing retreat from the safeguards of the First Amendment.

It is, sadly, no answer to say that this Court will not allow the trend to overwhelm us; that today's holding will be strictly confined to "Communists," as the Court's language implies. This decision can no more be contained than could the holding in *American Communications Assn.* v. *Douds,* 339 U. S. 382. In that case the Court sustained as an exercise of the commerce power an Act which required labor union officials to take an oath that they were not members of the Communist Party. The Court rejected the idea that the *Douds* holding meant that the Party and all its members could be attainted because of their Communist beliefs. It went to great lengths to explain that the Act held valid "touches only a relative handful of persons, leaving the great majority of persons of the identified affiliations and beliefs completely free from restraint." "[W]hile this Court sits," the Court proclaimed, no wholesale proscription of Communists or their Party can occur. 339 U. S., at 404, 410. I dissented and said:

> "Under such circumstances, restrictions imposed on proscribed groups are seldom static, even though the rate of expansion may not move in geometric progression from discrimination to arm-band to ghetto and worse. Thus I cannot regard the Court's holding as one which merely bars Communists from holding union office and nothing more. For its reasoning would apply just as forcibly to statutes barring Communists and their respective sympathizers from election to political office, mere mem-

[libel]; . . . . But the genius of our government will not permit the federal legislature to interfere with the subject; and the federal courts are, I presume, equally restrained by the principles of the constitution, and the amendments which have since been adopted."

bership in unions, and in fact from getting or holding any job whereby they could earn a living." 339 U. S., at 449.

My prediction was all too accurate. Today, Communists or suspected Communists have been denied an opportunity to work as government employees, lawyers, doctors, teachers, pharmacists, veterinarians, subway conductors, industrial workers and in just about any other job. See *Speiser* v. *Randall,* 357 U. S. 513, 531 (concurring opinion). Cf. *Barsky* v. *Board of Regents,* 347 U. S. 442, 456, 467, 472 (dissenting opinions). In today's holding they are singled out and, as a class, are subjected to inquisitions which the Court suggests would be unconstitutional but for the fact of "Communism." Nevertheless, this Court still sits! [24]

### III.

Finally, I think Barenblatt's conviction violates the Constitution because the chief aim, purpose and practice of the House Un-American Activities Committee, as disclosed by its many reports, is to try witnesses and punish them because they are or have been Communists or because they refuse to admit or deny Communist affiliations. The punishment imposed is generally punishment by humiliation and public shame. There is nothing strange or novel about this kind of punishment. It is in

---

[24] The record in this very case indicates how easily such restrictions spread. During the testimony of one witness an organization known as the Americans for Democratic Action was mentioned. Despite testimony that this organization did not admit Communists, one member of the Committee, insisted that it was a Communist front because "it followed a party line, almost identical in many particulars with the Communist Party line." Presumably if this accusation were repeated frequently and loudly enough that organization, or any other, would also be called a "criminal gang." Cf. *Feiner* v. *New York,* 340 U. S. 315, 321, 329 (dissenting opinions).

fact one of the oldest forms of governmental punishment known to mankind; branding, the pillory, ostracism and subjection to public hatred being but a few examples of it.[25] Nor is there anything strange about a court's reviewing the power of a congressional committee to inflict punishment. In 1880 this Court nullified the action of the House of Representatives in sentencing a witness to jail for failing to answer questions of a congressional committee. *Kilbourn* v. *Thompson,* 103 U. S. 168. The Court held that the Committee in its investigation of the Jay Cooke bankruptcy was seeking to exercise judicial power, and this, it emphatically said, no committee could do. It seems to me that the proof that the Un-American Activities Committee is here undertaking a purely judicial function is overwhelming, far stronger, in fact, than it was in the Jay Cooke investigation which, moreover, concerned only business transactions, not freedom of association.

The Un-American Activities Committee was created in 1938. It immediately conceived of its function on a grand scale as one of ferreting out "subversives" and especially of having them removed from government jobs.[26] It made many reports to the House urging re-

---

[25] See generally, XII Encyclopedia of the Social Sciences 714; Barnes, The Story of Punishment, 62–64; Lowie, Primitive Society, 398; Andrews, Old-Time Punishments (1890 ed.), 1–145, 164–187; IV Plutarch's Lives (Clough, New Nat. ed. 1914) 43–44.

[26] In its very first report it stated, "The committee has felt that it is its sworn duty and solemn obligation to the people of this country to focus the spotlight of publicity upon every individual and organization engaged in subversive activities regardless of politics or partisanship." It further claimed that, "While Congress does not have the power to deny to citizens the right to believe in, teach, or advocate, communism, fascism, and nazism, it does have the right to focus the spotlight of publicity upon their activities. . . ." H. R. Rep. No. 2, 76th Cong., 1st Sess. 9–10, 13. See also the statement of the Committee's first Chairman, "I am not in a position to say whether we can legislate effectively in reference to this matter, but I do know

moval of such employees.[27] Finally, at the instigation of
the Committee, the House put a rider on an appropria-
tion bill to bar three government workers from collecting
their salaries.[28] The House action was based on Com--
mittee findings that each of the three employees was a
member of, or associated with, organizations deemed
undesirable and that the "views and philosophies" of these
workers "as expressed in various statements and writ-
ings constitute subversive activity within the definition
adopted by your committee, and that [they are], there-
fore, unfit for the present to continue in Government
employment."[29] The Senate and the President agreed

that exposure in a democracy of subversive activities is the most
effective weapon that we have in our possession." 83 Cong. Rec.
7570 (1938).

[27] See, e. g., H. R. Rep. No. 2748, 77th Cong., 2d Sess. 5. "On
September 6, 1941, the chairman of this committee wrote the Presi-
dent a letter, accompanied by 43 exhibits, detailing the Communist
affiliation and background of the following officials . . . and sug-
gested that they be dismissed from their positions." "On November
28, 1941 . . . the chairman called the attention of the members to
the case of [the] principal economist in the Department of Agri-
culture"; "On January 15, 1942, the chairman of the commit-
tee . . . called attention to . . . one Malcolm Cowley. . . . Sev-
eral weeks later Mr. Cowley resigned his position with the Federal
Government"; "On March 28, 1942, the chairman wrote a letter to
the . . . Chairman of the Board of Economic Welfare, and called
attention to . . . eight of its employees and made particular reference
to one Maurice Parmelee . . . . The following week, Mr. Parmelee
was dismissed . . . ." Id., at 6. "In the Chairman's speech of
September 24 [1942] he also presented to the House the names of
19 officials of the Government . . . . Yet, to the committee's knowl-
edge, no action has been taken in the cases of the 19 officials." Id.,
at 8.

[28] Section 304 of the Urgent Deficiency Appropriation Act, 1943,
57 Stat. 431, 450. The history of this rider is detailed in United
States v. Lovett, 328 U. S. 303.

[29] See, e. g., H. R. Rep. No. 448, 78th Cong., 1st Sess. 6, 8. The
Un-American Activities Committee did not actually undertake the

to the rider, though not without protest. We held that statute void as a bill of attainder in *United States* v. *Lovett,* 328 U. S. 303 (1946), stating that its "effect was to inflict punishment without the safeguards óf a judicial trial" and that this "cannot be done either by a State or by the United States." 328 U. S., at 316–317.

Even after our *Lovett* holding, however, the Committee continued to view itself as the "only agency of government that has the power of exposure," and to work unceasingly and sincerely to identify and expose all suspected Communists and "subversives" in order to eliminate them from virtually all fields of employment:[30] How well it has succeeded in its declared program of "pitiless publicity and exposure" is a matter of public record. It is enough to cite the experience of a man who masqueraded as a Communist for the F. B. I. and who reported to this same Committee that since 1952 when his "membership" became known he has been unable to hold any job.[31] To

trials of these government employees. That task fell to a special Subcommittee of the Committee on Appropriations which was created in response to a speech by the Chairman of the Un-American Activities Committee. *Id.,* at 3.

[30] Virtually every report of the Committee emphasizes that its principal function is exposure and that once exposed subversives must be driven out. Space, however, prevents listing more than a random sampling of statements by the Committee. These are given in an Appendix to this opinion, *post,* p. 163. For other similar statements by the Committee and its members see, *e. g.,* notes 26, 27, supra; 31–37, *infra; Watkins* v. *United States,* 354 U. S. 178; *United States* v. *Josephson,* 165 F. 2d 82, 93 (dissenting opinion); *Barsky* v. *United States,* 83 U. S. App. D. C. 127, 138, 167 F. 2d 241, 252 (dissenting opinion).

[31] This evidence was given before the Committee on May 7, 1959, in Chicago, Ill. It has not yet been published.

Even those the Committee does not wish to injure are often hurt by its tactics, so all-pervasive is the effect of its investigations.

"It has been brought to the attention of the committee that many persons so subpenaed . . . have been subjected to ridicule and dis-

accomplish this kind of result, the Committee has called witnesses who are suspected of Communist affiliation, has subjected them to severe questioning and has insisted that each tell the name of every person he has ever known at any time to have been a Communist, and, if possible, to give the addresses and occupations of the people named. These names are then indexed, published, and reported to Congress, and often to the press.[32] The same technique is employed to cripple the job opportunities of those who strongly criticize the Committee or take other actions it deems undesirable.[33] Thus, in 1949, the Com-

crimination as a result of having received such subpenas"; "The committee . . . has met with many obstacles and difficulties. Not the least of these has been the reluctance of former Communists to give testimony before the committee which might bring upon them public censure and economic retaliation"; "To deny to these *cooperative* witnesses a full opportunity for social, economic, and political rehabilitation . . . will . . . render more difficult the obtaining of authentic . . . information." H. R. Rep. No. 2431, 82d Cong., 2d Sess. 5. (Italics added.)

"While the American people . . . were fortunate to have this testimony, some of the witnesses themselves were not. Instances have come to the committee's attention where several of these witnesses have been forced from gainful employment after testifying. Some have been released from the employment which they competently held for years prior to their testimony." H. R. Rep. No. 2516, 82d Cong., 2d Sess. 3.

[32] Descriptions of the size and availability of Committee's files as well as the efficiency of its cross-indexing system can be found in most of its reports. See, *e. g.*, H. R. Rep. No. 2742, 79th Cong., 2d Sess. 16–17; H. R. Rep. No. 1950, 81st Cong., 2d Sess. 18–23; H. R. Rep. No. 2431, 82d Cong., 2d Sess. 24–28.

[33] It is impossible even to begin to catalogue people who have been stigmatized by the Committee for criticizing it. In 1942 the Committee reported "Henry Luce's Time magazine has been drawn sucker-fashion into this movement to alter our form of government. . . ." H. R. Rep. No. 2277, 77th Cong., 2d Sess. 2. In 1946 Harold Laski and socialists generally were attacked for their "impertinence in suggesting that the United States should trade its system of free economy

mittee reported that it had indexed and printed some 335,000 names of people who had signed "Communist" petitions of one kind or another.[34] All this the Committee did and does to punish by exposure the many phases of "un-American" activities that it reports cannot be reached by legislation, by administrative action, or by any other agency of Government, which, of course, includes the courts.

The same intent to expose and punish is manifest in the Committee's investigation which led to Barenblatt's conviction. The declared purpose of the investigation was to identify to the people of Michigan the individuals responsible for the, alleged, Communist success there.[35] The Committee claimed that its investigation "uncovered" members of the Communist Party holding positions in the school systems in Michigan; that most of the teachers subpoenaed before the Committee refused to answer questions on the ground that to do so might result in

---

for some brand of Socialism." The Committee deemed it "imperative" that it ascertain the "methods used to enable Mr. Laski to broadcast to [a] rally." H. R. Rep. No. 2233, 79th Cong., 2d Sess. 46–47. In 1951 a full report was issued on a "communist lobby"— a committee formed to urge defeat of a communist control bill before Congress. Among the distinguished sponsors of the group listed by the committee was the late Prof. Zechariah Chafee. The Committee, nevertheless, advised "the American public that individuals who knowingly and actively support such a propaganda outlet .. . . are actually aiding and abetting the Communist program in the United States." H. R. Rep. No. 3248, 81st Cong., 2d Sess. 1, 11–12, 15. See also, Gellhorn, Report on a Report of the House Committee on Un-American Activities, 60 Harv. L. Rev. 1193.

[34] H. R. Rep. No. 1950, 81st Cong., 2d Sess. 19.

[35] "The 1954 hearings were set up by the committee in order to demonstrate to the people of Michigan the fields of concentration of the Communist Party in the Michigan area, and the identity of those individuals responsible for its success." H. R. Rep. No. 57, 84th Cong., 1st Sess. 15.

self-incrimination, and that most of these teachers had lost their jobs. It then stated that "the Committee on Un-American Activities approves of this action. . . ." [36] Similarly, as a result of its Michigan investigation, the Committee called upon American labor unions to amend their constitutions, if necessary, in order to deny membership to any Communist Party member.[37] This would, of course, prevent many workers from getting or holding the only kind of jobs their particular skills qualified them for. The Court, today, barely mentions these statements, which, especially when read in the context of past reports by the Committee, show unmistakably what the Committee was doing. I cannot understand why these reports are deemed relevant to a determination of a congressional intent to investigate communism in education, but irrelevant to any finding of congressional intent to bring about exposure for its own sake or for the purposes of punishment.

I do not question the Committee's patriotism and sincerity in doing all this.[38] I merely feel that it cannot be done by Congress under our Constitution. For, even assuming that the Federal Government can compel witnesses to testify as to Communist affiliations in order to subject them to ridicule and social and economic retaliation, I cannot agree that this is a legislative function. Such publicity is clearly punishment, and the Constitution

[36] *Id.,* at 17.

[37] "[T]he Committee on Un-American Activities calls upon the American labor movement . . . to amend its constitutions where necessary in order to deny membership to a member of the Communist Party or any other group which dedicates itself to the destruction of America's way of life." *Ibid.*

[38] Sincerity and patriotism do not, unfortunately, insure against unconstitutional acts. Indeed, some of the most lamentable and tragic deaths of history were instigated by able, patriotic and sincere men. See generally Mill, On Liberty (1885 ed.), 43–48.

allows only one way in which people can be convicted and punished.. As we said in *Lovett,* "Those who wrote our Constitution well knew the danger inherent in special legislative acts which take away the life, liberty or property of particular named persons because the legislature thinks them guilty of conduct which deserves punishment. *They intended to safeguard the people of this country from punishment without trial by duly constituted courts."* 328 U. S., at 317. (Italics added.) Thus if communism is to be made a crime, and Communists are to be subjected to "pains and penalties," I would still hold this conviction bad, for the crime of communism, like all others, can be punished only by court and jury after a trial with all judicial safeguards.

It is no answer to all this to suggest that legislative committees should be allowed to punish if they grant the accused some rules of courtesy or allow him counsel. For the Constitution proscribes *all* bills of attainder by State or Nation, not merely those which lack counsel or courtesy. It does this because the Founders believed that punishment was too serious a matter to be entrusted to any group other than an independent judiciary and a jury of twelve men acting on previously passed, unambiguous laws, with all the procedural safeguards they put in the Constitution as essential to a fair trial—safeguards which included the right to counsel, compulsory process for witnesses, specific indictments, confrontation of accusers, as well as protection against self-incrimination, double jeopardy and cruel and unusual punishment—in short, due process of law. Cf. *Chambers* v. *Florida,* 309 U. S. 227. They believed this because not long before worthy men had been deprived of their liberties, and indeed their lives, through parliamentary trials without these safeguards. The memory of one of these, John Lilburne—banished and disgraced by a parliamentary

committee on penalty of death if he returned to his country—was particularly vivid when our Constitution was written. His attack on trials by such committees and his warning that "what is done unto any one, may be done unto every one" [39] were part of the history of the times

---

[39] "For certainly it cannot be denied, but if he be really an offender, he is such by the breach of some law, made and published before the fact, and ought by due process of law, and verdict of 12 men, to be thereof convict, and found guilty of such crime; unto which the law also hath prescribed such a punishment agreeable to that our fundamental liberty; which enjoineth that no freeman of England should be adjudged of life, limb, liberty, or estate, but by Juries; a freedom which parliaments in all ages contended to preserve from violation; as the birthright and chief inheritance of the people, as may appear most remarkably in the Petition of Right, which you have stiled that most excellent law.

"And therefore we trust upon second thoughts, being the parliament of England, you will be so far from bereaving us, who have never forfeited our right, of this our native right, and way of Trials by Juries, (for what is done unto any one, may be done unto every one), that you will preserve them entire to us, and to posterity, from the encroachments of any that would innovate upon them. . . .

"And it is believed, that . . . had [the cause] at any time either at first or last been admitted to a trial at law, and had passed any way by verdict of twelve sworn men: all the trouble and inconveniences arising thereupon had been prevented: the way of determination by major votes of committees, being neither so certain nor so satisfactory in any case as by way of Juries, the benefit of challenges and exceptions, and unanimous consent, being all essential privileges in the latter; whereas committees are tied to no such rules, but are at liberty to be present or absent at pleasure. Besides, Juries being birthright, and the other but new and temporary, men do not, nor, as we humbly conceive, ever will acquiesce in the one as in the other; from whence it is not altogether so much to be wondered at, if upon dissatisfactions, there have been such frequent printing of men's cases, and dealings of Committees, as there have been; and such harsh and inordinate heats and expressions between parties interested, such sudden and importunate appeals to your authority, being indeed all alike out of the true English road, and leading into

which moved those who wrote our Constitution to determine that no such arbitrary punishments should ever occur here. It is the protection from arbitrary punishments through the right to a judicial trial with all these safeguards which over the years has distinguished America from lands where drumhead courts and other similar "tribunals" deprive the weak and the unorthodox of life, liberty and property without due process of law. It is this same right which is denied to Barenblatt, because the Court today fails to see what is here for all to see— that exposure and punishment is the aim of this Committee and the reason for its existence. To deny this is to ignore the Committee's own claims and the reports it has issued ever since it was established. I cannot believe that the nature of our judicial office requires us to be so blind, and must conclude that the Un-American Activities Committee's "identification" and "exposure" of Communists and suspected Communists, like the activities of the Committee in *Kilbourn* v. *Thompson,* amount to an encroachment on the judiciary which bodes ill for the liberties of the people of this land.

Ultimately all the questions in this case really boil down to one—whether we as a people will try fearfully and futilely to preserve democracy by adopting totalitarian methods, or whether in accordance with our traditions and our Constitution we will have the confidence and courage to be free.

I would reverse this conviction.

---

nothing but trouble and perplexity, breeding hatred and enmities between worthy families, affronts and disgust between persons of the same public affection and interest, and to the rejoicing of none but public adversaries. All which, and many more inconveniences, can only be avoided, by referring all such cases to the usual Trials and final determinations of law." 5 Howell's State Trials 411–412, Statement of John Lilburne (1653).

## APPENDIX TO OPINION OF MR. JUSTICE BLACK, DISSENTING.

RANDOM SELECTION OF STATEMENTS BY THE HOUSE UN-AMERICAN ACTIVITIES COMMITTEE ON EXPOSURE AND PUNISHMENT OF "SUBVERSIVES."

"[T]o inform the American people of the activities of any such organizations . . . is the real purpose of the House Committee." "The purpose of this committee is the task of protecting our constitutional democracy by turning the light of pitiless publicity on [these] organizations." H. R. Rep. No. 1476, 76th Cong., 3d Sess. 1-2, 24.

"The very first exposure which our committee undertook in the summer of 1938 was that of the German-American Bund." "Other organizations . . . have been greatly crippled . . . as a result of our exposures. The American Youth Congress once enjoyed a very considerable prestige . . . . Today many of its distinguished former sponsors refuse to be found in its company. . . . We kept the spotlight of publicity focused upon the American Youth Congress, and today it is clear to all that, in spite of a degree of participation in its activities by many fine young people, it was never at its core anything less than a tool of Moscow." "This committee is the only agency of Government that has the power of exposure. . . . There are many phases of un-American activities that cannot be reached by legislation or administrative action. We believe that the committee has shown that fearless exposure . . . is the . . . answer" H. R. Rep. No. 1, 77th Cong., 1st Sess. 21-22, 24.

"Our investigation has shown that a steady barrage against Congress comes . . . from the New Republic, one of whose editors . . . was recently forced out of an $8,000

Government job by the exposure of his Communist activities." H. R. Rep. No. 2277, 77th Cong., 2d Sess. 3.

"[T]he House Committee on Un-American Activities is empowered to explore and expose activities by un-American individuals and organizations which, while sometimes being legal, are nonetheless inimical to our American concepts." The Committee recommends that Congress "discharge . . . any employee or official of the Federal Government whose loyalty to the United States is found to be in doubt." H. R. Rep. No. 2742, 79th Cong., 2d Sess. 16, 17.

"Index of Persons and Organizations." (Six pages of names follow.) H. R. Rep. No. 2233, 79th Cong., 2d Sess. III–VIII.

"Early in 1947 the committee adopted the following eight point program . . . .

"1. To expose and ferret out the Communists and Communist sympathizers in the Federal Government.

"2. To spotlight the spectacle of . . . Communists . . . in American labor."

"In a sense the storm of opposition to the activities of the committee is a tribute to its achievements in the field of exposure . . . ." Report of the Committee on Un-American Activities to the United States House of Representatives, 80th Cong., 2d Sess., Dec. 31, 1948, 2, 3 (Committee print).

"The committee would like to remind the Congress that its work is part of an 11-year continuity of effort that began . . . in August 1938. The committee would also like to recall that at no time in those 11 years has it ever wavered from a relentless pursuit and exposure." "In the course of its investigations . . . the committee has made available a large, completely indexed, and readily accessible reference collection of lists of signers of Communist Party election petitions." H. R. Rep. No. 1950, 81st Cong., 2d Sess. 15, 19.

"To conduct the exposé . . . it was necessary for the investigative staff to interview over 100 persons . . . .

"The same tedious investigation of details was necessary prior to the successful exposure . . . in the Territory of Hawaii." "As a result of the investigation and hearings held by the committee, Dolivet's contract with the United Nations has not been renewed, and it is the committee's understanding that he was removed from editorship of the United Nations World." H. R. Rep. No. 3249, 81st Cong., 2d Sess. 4, 5.

"During 1951 the committee's hearings disclosed the positive identification of more individuals . . . than during any preceding year." "If communism in Hollywood is now mythical, it is only because this committee conducted three investigations to bring it about. The industry itself certainly did not accomplish this." "The committee's investigation . . . was concerned almost entirely with the problem of exposure of the actual members of the Communist Party and did not deal, except in a few instances, with . . . fellow travelers." "On the question of fellow travelers, suffice it to say . . . 'The time has come now when even the fellow traveler must get out.'" "Dr. Struik was identified as a Communist teacher . . . . Nevertheless, he was permitted to teach . . . until this year." "With individuals like . . . Struik . . . teaching in our leading universities, your committee wonders who the Professor Struiks were . . . who led Alger Hiss along the road of communism." H. R. Rep. No. 2431, 82d Cong., 2d Sess. 6, 8–9, 16–17.

"In this annual report, the committee feels that the Congress and the American people will have a much clearer and fuller picture . . . by having set forth the names and, where possible, the positions occupied by individuals who have been identified as Communists, or former Communists, during the past year." "The committee considers the failure of certain trade-unionists to

rid themselves of Communists to be a national disgrace." "The following persons were identified." (Approximately fifty pages of names follow.) H. R. Rep. No. 2516, 82d Cong., 2d Sess. 6–7, 12–27, 28–34, 36–40, 41–56, 58–67 (similar lists can be found in various other reports).

"The focal point of the investigation into the general area of education was to the individual who had been identified." "The question has been asked as to what purpose is served by the disclosure of the names of individuals who may long ago have left the conspiracy." "The committee has no way of knowing the status of his membership at present until he is placed under oath and the information is sought to be elicited." H. R. Rep. No. 1192, 83d Cong., 2d Sess. 1, 7.

Mr. Justice Brennan, dissenting.

I would reverse this conviction. It is sufficient that I state my complete agreement with my Brother Black that no purpose for the investigation of Barenblatt is revealed by the record except exposure purely for the sake of exposure. This is not a purpose to which Barenblatt's rights under the First Amendment can validly be subordinated. An investigation in which the processes of law-making and law-evaluating are submerged entirely in exposure of individual behavior—in adjudication, of a sort, through the exposure process—is outside the constitutional pale of congressional inquiry. *Watkins* v. *United States,* 354 U. S. 178, 187, 200; see also *Sweezy* v. *New Hampshire,* 354 U. S. 234; *NAACP* v. *Alabama,* 357 U. S. 449; *Uphaus* v. *Wyman, ante,* p. 82 (dissenting opinion).