Harry **KEYISHIAN**, George Hochfield, Newton Garver, Ralph N. Maud, and George E. Starbuck, Plaintiffs,

v.

**BOARD OF REGENTS OF the UNIVERSITY OF the STATE OF NEW YORK,** Board of Trustees of the State University of New York, State University of New York at Buffalo, Samuel B. Gould, Clifford C. Furnas, J. Lawrence Murray, Arthur Levitt, Department of Civil Service of the State of New York, Civil Service Commission of the State of New York, Mary Goode Krone, and Alexander A. Falk, Defendants.

Civ. A. No. 10994.

United States District Court
W. D. New York.

Jan. 5, 1966.

Richard Lipsitz, of Lipsitz, Green & Fahringer, Buffalo, N. Y. (Rosario J. DiLorenzo, Buffalo, N. Y., on the brief), for plaintiffs.

John C. Crary, Jr., Albany, N. Y. (Richard A. Foster and David L. Segel, Albany, N. Y., on the brief), for defendants Board of Trustees—State University of New York, State University of New York at Buffalo, Clifford C. Furnas, Samuel B. Gould, and J. Lawrence Murray.

Ruth Kessler Toch, Albany, N. Y. (Louis J. Lefkowitz, Atty. Gen. of State of New York, on the brief), for defendants Board of Regents of University of State of New York, Department of Civil Service of State of New York, Civil Service Commission of State of New York, Mary Goode Krone, and Alexander A. Falk.

Before MOORE, Circuit Judge, BURKE, Chief Judge, and HENDERSON, District Judge.

MOORE, Circuit Judge.

This suit challenges the constitutionality of Sections 3021 and 3022 of the New York Education Law, Section 105 of the New York Civil Service Law, Section 244 of Article XVIII of the Rules of the Board of Regents of the State of New York, and the procedures used under these various statutes and regulations. Section 105 of the Civil Service Law and Sections 3021 and 3022 of the Education Law, as they are now in effect, are set forth in the margin.[1]

1. *Civil Service Law*
§ 105. *Subversive activities: disqualification*
1. Ineligibility of persons advocating overthrow of government by force or unlawful means. No person shall be appointed to any office or position in the service of the state or of any civil division thereof, nor shall any person employed in any such office or position be continued in such employment, nor shall any person be employed in the public service as superintendent, principal or teacher in a public school or academy or in a state college or any other state educational institution who:

  (a) by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown or overturned by force, violence or any unlawful means; or

  (b) prints, publishes, edits, issues or sells any book, paper, document or written or printed matter in any form containing or advocating, advising or teaching the doctrine that the government of the United States or of any state or of any political subdivision thereof should be overthrown by force, violence or any unlawful means, and who advocates, advises, teaches, or embraces the duty, necessity or propriety of adopting the doctrine contained therein; or

  (c) organizes or helps to organize or becomes a member of any society or group of persons which teaches or advocates that the government of the United States or of any state or of any political subdivision thereof shall be overthrown by force or violence, or by any unlawful means.

For the purpose of this section, membership in the communist party of the United States of America or the communist party of the state of New York shall constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the service of the state or of any city or civil division thereof.

2. A person dismissed or declared ineligible pursuant to this section may within four months of such dismissal or declaration of ineligibility be entitled to petition for an order to show cause signed by a justice of the supreme court, why a hearing on such charges should not be had. Until the final judgment on said hearing is entered, the order to show cause shall stay the effect of any order of dismissal or ineligibility based on the provisions of this section; provided, however, that during such stay a person so dismissed shall be suspended without pay, and if the final determination shall be in his favor he shall be restored to his position with pay for the period of such suspension less the amount of compensation which he may have earned in any other employment or occupation and any unemployment insurance benefits he may have received during such period. The hearing shall consist of the taking of testimony in open court with opportunity for cross examination. The burden of sustaining the validity of the order of dismissal or ineligibility by a fair preponderance of the credible evidence shall be upon the person making such dismissal or order of ineligibility.

3. Removal for treasonable or seditious acts or utterances. A person in the civil service of the state or of any civil division thereof shall be removable therefrom for

Section 244 of Article XVIII of the Rules of the Board of Regents, promulgated after the enactment of Section 3022 of the Education Law, provides that school authorities shall put into effect certain procedures for disqualification and removal of employees who violate Section 3021 of the Education Law or Section 105 of the Civil Service Law. Before appointment of an employee, the nominating official shall inquire of his former employers and of others whether he is known to have violated the statutory provisions, and no person found to have violated the statutes shall be eligible for employment. Each year school authorities shall prepare a report on each employee, stating whether there is any evidence, including membership in an organization listed as subversive by the Board of Regents, indicating that the employee has violated the statutes. If there is such evidence, the reporting official is to recommend the employee's dismissal, and within 90 days after the recommendation has been submitted, the

the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts while holding such position. For the purpose of this subdivision, a treasonable word or act shall mean "treason", as defined in the penal law; a seditious word or act shall mean "criminal anarchy" as defined in the penal law.

*Education Law*

§ 3021. *Removal of superintendents, teachers and employees for treasonable or seditious acts or utterances*

A person employed as superintendent of schools, teacher or employee in the public schools, in any city or school district of the state, shall be removed from such position for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts while holding such position.

§ 3022. *Elimination of subversive persons from the public school system*

1. The board of regents shall adopt, promulgate, and enforce rules and regulations for the disqualification or removal of superintendents of schools, teachers or employees in the public schools in any city or school district of the state and the faculty members and all other personnel and employees of any college or other institution of higher education owned and operated by the state or any subdivision thereof who violate the provisions of section three thousand twenty-one of this article or who are ineligible for appointment to or retention in any office or position in such public schools or such institutions of higher education on any of the grounds set forth in section twelve-a of the civil service law and shall provide therein appropriate methods and procedure for the enforcement of such sections of this article and the civil service law.

2. The board of regents shall, after inquiry, and after such notice and hearing as may be appropriate, make a listing of organizations which it finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the government of the United States or of any state or of any political subdivision thereof shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or propriety of adopting any such doctrine, as set forth in section twelve-a of the civil service law. Such listings may be amended and revised from time to time. The board, in making such inquiry, may utilize any similar listings or designations promulgated by any federal agency or authority authorized by federal law, regulation or executive order, and for the purposes of such inquiry, the board may request and receive from such federal agencies or authorities any supporting material or evidence that may be made available to it. The board of regents shall provide in the rules and regulations required by subdivision one hereof that membership in any such organization included in such listing made by it shall constitute prima facie evidence of disqualification for appointment to or retention in any office or position in the public schools of the state.

3. The board of regents shall annually, on or before the fifteenth day of February, by separate report, render to the legislature, a full statement of measures taken by it for the enforcement of such provisions of law and to require compliance therewith. Such reports shall contain a description of surveys made by the board of regents, from time to time, as may be appropriate, to ascertain the extent to which such provisions of law have been enforced in the city and school districts of the state.

Section 12-a of the Civil Service Law, referred to in Section 3022 of the Education Law, now appears as Section 105(1) and (2) of the Civil Service Law, N.Y.Sess. Laws 1958, ch. 790, § 105.

school authorities must either prefer formal charges or reject the recommendation. If charges are preferred against persons serving on probation or having tenure, statutory dismissal procedures shall be followed. "In proceedings against persons serving under contract and not under the provisions of a tenure law, the school authorities shall conduct such hearings * * * as they deem the exigencies warrant, before taking final action on dismissal. In all cases, all rights to a fair trial, representation by counsel and appeal or court review as provided by statute or the Constitution shall be scrupulously observed."

The State University of New York at Buffalo, attempting to comply with the Regents' rules, distributed to all members of the academic staff a booklet containing the Regents' rules and the underlying statutes, and required each faculty member to sign a certificate (the "Feinberg certificate") declaring that he had read the Regents' rules; that the rules and the statutes cited therein constituted terms of his employment; and that he was not now a member of the Communist Party and if he ever had been, he had communicated that fact to the president of the university.

Four of the five plaintiffs in the present action—Keyishian, Hochfield, Garver, and Maud, all under term appointments to the academic staff of the University—declined to sign the certificates, and were notified that if they did not sign as requested their terms would not be renewed on grounds of insubordination. Keyishian's term has ended and his appointment has not been renewed. The terms of two of the other three have not expired and they remain in their former positions. They have been informed that dismissal proceedings will not be started against them until the validity of the statutes, rules, and procedures is determined in the present suit. Maud accepted a position after his term expired in September 1965, again subject to the determination of the present suit, but has resigned from the university.

The fifth plaintiff, Starbuck, was appointed on September 1, 1963, to a one-year term as a specialist in acquisitions for the library. After starting work he was required to fill out a form, one question of which asked: "Have you ever advised or taught or were you ever a member of any society or group of persons which taught or advocated the doctrine that the government of the United States or of any political subdivision thereof should be overthrown or overturned by force, violence, or any unlawful means?" He refused to answer and was dismissed from his appointment on June 18, 1964.

On July 8, 1964, the plaintiffs brought a class action against a large part of the educational hierarchy of the State of New York, seeking an injunction against enforcement of the civil statutes concerning employment of subversives and of the regulations and procedures used to implement those statutes. The District Court held that no substantial federal question was raised, and accordingly refused to refer the case to a three-judge district court. 233 F.Supp. 752 (W.D. N.Y., 1964). The Court of Appeals for the Second Circuit reversed and directed that the case be heard before a three-judge court. 345 F.2d 236 (2 Cir., 1965).

## I. The Constitutionality of the State's Objective.

The plaintiffs argue in part that the complex of laws, regulations, and procedures under attack has no constitutionally valid objective—that they infringe upon freedom of expression without being justified by any legitimate state interest.

The Supreme Court in the *Adler* case, considering statutes the predecessors of the ones now in question, described the importance of the state interest in preventing the use of the educational system as a platform for urging students to overthrow government by violent means:

> A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this,

the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees as to their fitness to maintain the integrity of the schools as a part of ordered society, cannot be doubted.

Adler v. Board of Education, 342 U.S. 485, 493, 72 S.Ct. 380, 385, 96 L.Ed. 517 (1952).

The Supreme Court has not changed its recognition of the importance of this state interest in recent cases. In 1958, it quoted the above language from *Adler* with approval, in upholding the dismissal for "incompetency" of a Pennsylvania school teacher who refused to answer a question as to his activities in the Communist Party. Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958). In Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), the Court upheld the contempt conviction of a former teaching fellow at the University of Michigan, based on his refusal to answer questions of a congressional committee as to his past and present membership in the Communist party. The Court indicated that Congress had a legitimate interest in "inquiring into the extent to which the Communist Party has succeeded in infiltrating into our universities * * * persons and groups committed to furthering the objective of overthrow." 360 U.S. at 129, 79 S.Ct. at 1094. In Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961), the Court struck down as unconstitutionally vague a Florida statute requiring state employees to swear that they had never lent their "aid, support, advice, counsel, or influence to the Communist Party"; but the Court did not "question the power of a State to safeguard the public service from disloyalty." 368 U.S. at 288, 82 S.Ct. at 281. Nor does the recent decision of Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), cast any doubt upon the power of a state to act to prevent the

incitement of violent overthrow on university campuses.

[1] The plaintiffs argue that the legitimate state objective recognized by the Court in *Adler* is not present here, since the teachers here hold positions at universities rather than at public schools. The argument appears to be based upon the comparative maturity of mind of the university student, which entitles him to the privilege of exposure to conflicting political philosophies. But as the American Association of University Professors wrote in their amicus brief in *Barenblatt*, supra, a case involving a university teacher, "The claims of academic freedom cannot be asserted unqualifiedly. The social interest it embodies is but one of a larger situation, within which the interest in national self-preservation * * * also prominently appear[s]." Brief, p. 24. It would not be constitutional to prevent the *teaching* of Communist philosophy at the university level; but it would be dangerously anomalous to proscribe the *advocacy* of violent overthrow of government in all parts of the United States, see Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), except in the breeding-grounds of the future leaders of the nation. The interest in national self-preservation—"the ultimate value of any society," *Dennis* at 509, 71 S.Ct. at 867—applies to the university campus as well as to the rest of our society.

## II. The Constitutionality of the Means Used to Attain the State's Objective.

The plaintiffs maintain that even if the statutes and regulations under attack assert a legitimate state objective, they do so in a manner which unduly restricts other interests protected by the Constitution. The plaintiffs invoke a variety of constitutional clauses in support of their position.

## A. The Ex Post Facto Clause.

An ex post facto law is "one which imposes a punishment for an act which was not punishable at the time it

was committed; or imposes additional punishment to that then prescribed; or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required." Cummings v. State of Missouri, 4 Wall. 277, 71 U.S. 277, 325–326, 18 L.Ed. 356 (1867).

■ In the present case, the plaintiffs either have been dismissed or are threatened with dismissal for failure to answer questions put to them under procedures designed to implement § 3022 of the Education Law, which was made applicable to colleges in 1953: L.1953, c. 681, § 1. Before being dismissed or threatened with dismissal, the plaintiffs were repeatedly told the purpose of the questions, the statutory basis for the questions, and the possibility that dismissal proceedings would be started if they failed to answer the questions. The proscription of their conduct preceded the conduct itself, so that the ex post facto clause does not apply. See Garner v. Board of Public Works, 341 U.S. 716, 721, 71 S.Ct. 909, 95 L.Ed. 1317 (1951), in which the Court rejected an argument that dismissal of municipal employees for failure to take an oath was ex post facto punishment, with the observation that the activity covered by the oath had been proscribed years before the employees were asked to take the oath.

## B. The Bill of Attainder Clause.

■ "[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." United States v. Lovett, 328 U.S. 303, 315–316, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946). The plaintiffs contend that Section 3022 of the Education Law, coupled with the Regents' regulations under that section and Section 105(1) (c) of the Civil Service Law, constitute a bill of attainder, since these provisions single out as ineligible for employment in state schools members of the Communist Party of New York and of the Communist Party of the United States. A similar argument was made and rejected in the *Adler* case.

■ The plaintiffs put particular reliance on United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), in which the Court held unconstitutional as a bill of attainder a statute making it criminal for anyone "who is or has been a member of the Communist Party" to serve as an officer of a labor union within five years of the termination of his membership in the Communist Party. However, the statute attacked in the *Brown* case differs fundamentally from the statutes and regulations challenged here in the nature of the part played by the legislature in determining the underlying facts from which adverse consequences would follow. Assuming without deciding that dismissal from state employment can constitute "punishment"—a question left open in *Garner*, 341 U.S. 716 at 721, 71 S.Ct. 909 (1951) and not touched upon in *Brown*—the bill of attainder clause only forbids "punishment" imposed by a legislature as a result of "trial by legislature." *Brown*, 381 U.S. at 442, 85 S.Ct. 1707. It is the unfairness of trial by a large body "peculiarly susceptible to popular clamor," 1 Cooley, Constitutional Limitations, 536–37 (8th ed. 1927) that underlies the bill of attainder clause. The court in *Brown* faced a statute involving just such a "trial by legislature"—a statute which specified the Communist Party by name, and made it a crime—automatically and incontestably—for a Party member to hold union office.

■ In the present case, disqualification from employment in the state schools did not follow automatically from a legislative determination that that Communist Party was a bad organization. Section 3022 of the Education Law provided that the Board of Regents shall, after full notice and hearing, make a list of organizations which it finds advocate the doctrine that government should be overthrown by force, violence, or other unlawful means. It was only after extensive hearings that the Board of Regents lists

two organizations under Section 3022; the Communist Party of New York and the Communist Party of the United States. These determinations were subject to judicial review under Article 78 of the Civil Practice Act, now Article 78 of the Civil Practice Law and Rules. Thompson v. Wallin, 301 N.Y. 476, 493, 95 N.E.2d 806, (1950), aff'd sub nom. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380 (1952).

Section 105(1) (c) of the Civil Service Law, which makes membership in either the Communist Party of New York or that of the United States "prima facie evidence" of disqualification for the state civil service, was based not on an original determination by the state legislature of the aims of the Communist Party, but upon the findings of the Board of Regents under Section 3022 of the Education Law. The preamble to the amendment incorporating the reference to the two parties makes clear that the purpose of the reference was to bring Section 105 into harmony with the determinations of the Board of Regents under Section 3022. N.Y.Sess.Laws 1958, c. 503, § 1.[2]

■■ Again unlike the statute struck down in *Brown*, Sections 105(1) (c) of the Civil Service Law and 3022 of the Education Law make membership in the Communist Party only "prima facie evi-

dence of disqualification" from state employment. The presumption is rebuttable; at a hearing, the employee "may deny (a) membership; (b) that the organization advocates the overthrow of the government by force; and (c) that he has knowledge of such advocacy." Lederman v. Board of Education, 276 App.Div. 527, 530, 96 N.Y.S.2d 466, 470 (2d Dept. 1950), aff'd sub nom. Thompson v. Wallin, 301 N.Y. 476, 95 N.E.2d 806 (1950), aff'd sub nom. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380 (1952). As the New York Court of Appeals stated in Thompson v. Wallin:

The phrase "prima facie evidence of disqualification" * * * imports a hearing at which one who seeks appointment to or retention in a public school position shall be afforded an opportunity to present substantial evidence contrary to the presumption sanctioned by the prima facie evidence * * *. Once such contrary evidence has been received, however, the official who made the order of ineligibility has thereafter the burden of sustaining the validity of that order by a fair preponderance of the evidence.

301 N.Y. 476 at 494, 95 N.E.2d 806 at 814–815. See also Hughes v. Board of Higher Education, 309 N.Y. 319, 130 N. E.2d 638 (1955).

---

2. The text of the preamble is as follows: *"Declaration of legislative intent.* The legislature takes cognizance that section three thousand twenty-two of the education law makes provision for the implementation and enforcement of section twelve-a of the civil service law [now Section 105 of the Civil Service Law] with respect to the elimination of subversive persons from the public school system; that such section three thousand twenty-two authorizes the board of regents, after notice and hearing, to list 'organizations which it finds to be subversive in that they advocate, advise, teach or embrace the doctrine that the government of the United States or of any state or of any political subdivision thereof shall be overthrown or overturned by force, violence or any unlawful means, or that they advocate, advise, teach or embrace the duty, necessity or

propriety of adopting any such doctrine, as set forth in section twelve-a of the civil service law'; that the board of regents, after notice and hearing, has so listed the communist party of the United States of America and the communist party of the state of New York; and that pursuant to such section three thousand twenty-two and rules and regulations adopted thereunder membership in either such organization constitutes prima facie evidence of disqualification for appointment to or retention in any office or position in the public schools of the state. It is the intent of the legislature to apply to all officers and employees subject to section twelve-a of the civil service law the same provision that membership in either of such organizations shall constitute prima facie evidence of disqualification for appointment or continued employment."

The disqualification of a teacher under these laws, in short, is not the result of a "legislative trial". The legislature in the first instance—in enacting Section 3022 of the Education Law—did nothing more than, in the language of *Brown,* 381 U.S. at 450, 85 S.Ct. at 1715, "set forth a generally applicable rule" as to the characteristics of organizations, membership in which should be evidence of disqualification. The determination of what organizations possessed those characteristics was left to an administrative body, to be made after notice, hearing, and opportunity for judicial review. The case closely resembles Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), in which the Court, holding that the Subversive Activities Control Act of 1950 was not a bill of attainder, stressed the "crucial constitutional significance of what Congress did when it rejected the approach of outlawing the Party by name and accepted instead a statutory program regulating not enumerated organizations but designated activities," 367 U.S. at 84–85, 81 S.Ct. at 1404, and pointed out that the initial findings under the Act "must be made after full administrative hearing, subject to judicial review * *." Id. at 87, 81 S.Ct. at 1405.

If anything, the statutes now under attack are less like a bill of attainder than the act held constitutional in Communist Party of United States v. Subversive Activities Control Board, since the New York statutes provide opportunity for hearing and judicial review not only for the organizations listed, but also for their members. In short, in terms of a recent analysis of the history and purpose of the bill of attainder clause, the New York legislature here laid down "rules of general applicability", leaving "the job of application to other tribunals." Comment, The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause, 72 Yale L.J. 330, 347, 350 (1962).

### C. The Due Process Clause.

Plaintiffs' principal challenge to the New York statutes and procedures is based on the protection afforded to free speech by the First Amendment, applicable to the states under the Fourteenth Amendment. Plaintiffs maintain that the New York laws and procedures impinge upon the rights of freedom of speech, thought, and expression more than is necessary to protect the state from violent overthrow, both by being too broad and vague, and by imposing an unfair burden on those who may be adversely affected, requiring them to justify their conduct.

### 1. Procedural Due Process and Speiser v. Randall.

Plantiffs' "burden of justification" argument rests in large part on Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), in which the Court held to be against due process a California statute which required veterans to file oaths declaring that they did not advocate the overthrow of government by force, violence, or other unlawful means, before they could receive a state tax exemption. The essence of the Court's opinion was that by putting the burden of taking the first step and of proving eligibility on the applicants, the statute made it more likely that the exemption would be denied in borderline cases, and therefore that "legitimate utterance will be penalized." 357 U.S. at 526, 78 S.Ct. 1332. The Court distinguished the *Garner* and *Douds* [American Communications Ass'n C. I. O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L. Ed. 925] cases, in which oaths were upheld as valid prerequisites to state employment and union office, by pointing out that those cases "concerned a limited class of persons in or aspiring to public positions by virtue of which they could, if evilly motivated, create serious danger to the public safety," id. at 527, 78 S.Ct. at 1343, and that in those cases persons by taking the oaths could retain their positions subject to further proceedings in which the government would have the

burden of proof. The Court also distinguished the New York statutes upheld in *Adler,* on the grounds that under those statutes "public-school teachers could be dismissed on securty grounds only after a hearing at which the official pressing the charges sustained his burden of proof by a fair preponderance of the evidence." 357 U.S. at 528 n. 8, 78 S.Ct. at 1343.

Later decisions have made clear that *Speiser* does not create a rule of law that a potential suspect in an area concerning freedom of speech must never be called upon to justify his conduct. E. g., Nelson v. County of Los Angeles, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960), upholding discharges of county employees based upon their refusal to answer questions concerning subversive activities put to them by a congressional subcommittee; Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961) and In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961), holding that admission to a state bar could be denied on the basis of an applicant's refusal to answer questions concerning Communist activities. Instead, *Speiser* holds that in a case concerning First Amendment freedoms, the burden of proof must rest upon the attacker as much as possible, consonant with the protection of the legitimate interest asserted by the attacker.

In the present case, the university requirement that all teachers sign "Feinberg certificates" may have raised problems under *Speiser,* although apparently the teachers could retain their positions by signing the certificates, subject only to further proceedings in which the state would bear the burden of proof. But the university has discontinued its reliance on the certificate procedure, as of June 10, 1965. The state now investigates prospective appointees by asking the candidate and others questions concerning his compliance with the laws. The candidate is given a chance to explain his doubts, not provided under the certificate procedure. Absolute refusal to answer is made grounds for refusal to appoint; but this seems reasonable, in light of the

opportunity to explain. Persons employed before June 10, 1965, shall not be deemed disqualified "solely by reason of" their failure to sign the Feinberg certificate. The State thus would have the burden of showing violations of the statutes, following the statutory procedures for dismissal as to teachers with tenure.

Plaintiffs maintain that teachers serving on contract and without tenure are denied procedural due process, since they are guaranteed by the Regents' regulations only "such hearings * * * as [the school authorities] deem the exigencies warrant * * *." In particular, plaintiffs point to the dismissal of Starbuck as evidence that the state will not give an adequate hearing to teachers without tenure.

█ It appears that after Starbuck failed to answer the question about subversive activities on his employment form, he was told that he must answer it yes or no, and could explain if he answered yes. He did not answer, and was dismissed. We understand the law of New York to be in accordance with the advice given to Starbuck by the university officials. Although a teacher without tenure, Starbuck would have had an opportunity to explain and a right to a full hearing on whether or not he had violated the substantive provisions of the law, if he had answered the question yes. Hughes v. Board of Higher Education, 309 N.Y. 319, 130 N.E.2d 638 (1955); Lederman v. Board of Education, 276 App.Div. 527, 96 N.Y.S.2d 466 (2d Dep't 1950), aff'd sub nom. Thompson v. Wallin, 301 N.Y. 476, 95 N.E.2d 806 (1950), aff'd sub nom. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380 (1952). In light of this opportunity for explanation and a hearing, Starbuck cannot complain of lack of procedural due process. His dismissal was for insubordination in refusing to answer a relevant inquiry, and the Constitution does not require any hearing on one's reasons for refusal to cooperate with a relevant inquiry. See Nelson v. County of Los Angeles, 362 U.S. 1, 80 S.Ct. 527 (1960); Konigsberg v. State Bar of California, 366 U.S. 36, 81

S.Ct. 997 (1961); and In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978 (1961). Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) may be distinguished, since in that case the Court found no necessary connection between Slochower's refusal to answer questions concerning activities twelve years before, put to him not by a school board but by a congressional committee, and his unfitness for service in the New York schools. Here Starbuck refused to answer a question put to him by school authorities concerning whether or not he presently advocated the violent overthrow of government.

■ Plaintiffs also assert that the provisions of Section 3022 of the Education Law and Section 105(1) of the Civil Service Law which make membership in the Communist Party prima facie evidence of disqualification for employment by the state are contrary to procedural due process. The same argument was before the Supreme Court in *Adler,* and the Court decisively rejected it:

> Membership in a listed organization found to be within the statute and known by the member to be within the statute is a legislative finding that the member by his membership supports the thing the organization stands for, namely, the overthrow of government by unlawful means. We cannot say that such a finding is contrary to fact or that "generality of experience" points to a different conclusion. Disqualification follows therefore as a reasonable presumption from such membership and support. Nor is there here a problem of procedural due process. The presumption is not conclusive but arises only in a hearing where the person against whom it may arise has a full opportunity to rebut it. * * * Where, as here, the relation between the fact found and the presumption is clear and direct and is not conclusive, the requirements of due process are satisfied.

342 U.S. 485, 494–496, 72 S.Ct. 380, 386 (1952).

In support of its position, the Court looked to the interpretation of the statute by the New York courts below. Lederman v. Board of Education, 276 App.Div. 527, 530, 96 N.Y.S.2d 466, 470 (2d Dept. 1950), aff'd sub nom. Thompson v. Wallin, supra, 301 N.Y. 476, 95 N.E. 806, 815 (1950). The courts of New York not having changed their interpretation of the presumption contained in these statutes, see Hughes v. Board of Higher Education, 309 N.Y. 319, 130 N.E.2d 638 (1955), there is no reason to hold the presumption violative of due process today.

*2. "Vagueness"*

■ The plaintiffs maintain that breadth of language renders the statutes under attack unconstitutional, because it tends to deter legitimate expression as well as expression which the State is justified in regulating. It is, of course, true that strict standards of darftsmanship are to be applied to a statute having a potentially inhibiting effect on speech; "a man may be the less required to act at his peril here, because the free dissemination of ideas may be the loser." Smith v. People of State of California, 361 U.S. 147, 151, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 (1959). However, we must examine the present statutory complex, as implemented by the Regents' regulations and as interpreted by the New York courts, to see whether it has a tendency to deter legitimate discussion and activities as well as to carry out the permissible objective of preventing the advocacy of violent overthrow of government.

Subsection 2 of Section 3022 of the Education Law provides that the Board of Regents shall list organizations found to "advocate, advise, teach or embrace the doctrine that the government of the United States or of any state or political subdivision thereof shall be overthrown * * * by force" or found to "advocate, advise, teach, or embrace the duty, necessity, or propriety of adopting any such doctrine * * *." Section 105(1) of the Civil Service Law lists three causes

for ineligibility for employment in the state civil service; wilfully advocating, advising, or teaching the doctrine of violent overthrow of government; publishing, editing, or selling any printed matter containing such a doctrine, while advocating the necessity or propriety of adopting the doctrine; and organizing or becoming a member of a group of persons advocating such a doctrine.

■ Legitimate activities are not deterred by these sections of the statutes. Not teaching Communist theory in a course in economic or political history; only teaching that government shall or should "be overthrown * * * by force" is a basis for adverse consequences under these sections. Not innocent membership in the Communist Party; in contrast to what could have been deterred by the oath struck down in Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), only knowing membership in an organization on advocating the violent overthrow of government is grounds for ineligibility for state employment. Lederman v. Board of Education, 276 App.Div. 527, 530, 96 N.Y.S.2d 466, 470 (2d Dept. 1950), aff'd sub nom. Thompson v. Wallin, 301 N.Y. 476, 95 N.E.2d 806 (1950), aff'd sub nom. Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380 (1952); see also Adler v. Wilson, 282 App.Div. 418, 123 N.Y.S.2d 655 (3d Dept. 1953).

Nor do these sections deter all distribution of Communist propaganda, or the editing of Communist literature. Under Section 105(1) (b), a distributor or editor of subversive literature must also advocate or embrace the "duty, necessity, or propriety" of adopting the doctrine of violent overthrow, before he can be disqualified from state employment. Finally, the sections just described do not deter representing the Communist Party in a lawsuit, or defending the constitutional rights of the Communist Party in a newspaper article, or voting for a candidate also supported by the Communist Party— the legitimate activities which the Supreme Court feared might be deterred by the broad oaths struck down in Cramp v.

Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, (1961) (state employees had to swear that they had never lent their "aid, support, advice, counsel or influence to the Communist Party") and in Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316 (1964) (state teachers had to swear, among other things, that they did not aid any person to aid in the commission of any act intended to alter the constitutional form of government by force or violence).

■ The Supreme Court in Baggett made clear that narrowly drawn statutes aimed wholly at the control of subversive activities would be upheld as constitutional. The Court distinguished the broad oath before it in Baggett from the oath upheld in Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951), on the grounds that the Gerende oath required a candidate for state office to swear only that he is not engaged "in one way or another in the attempt to overthrow the government by force or violence," and that he is not knowingly a member of an organization engaged in such an attempt. The sections of the New York statutes just analyzed proscribe no more than the oath upheld in Gerende, and seem less questionable even than Gerende since they place the burden of taking the first step and the burden of proof on the official challenging eligibility. The Supreme Court upheld these sections, 3022 of the Education Law and 105(1) and (2) of the Civil Service Law (the last two subsections then being known as 12(a) of the Civil Service Law), in Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380 (1952), although the sections were attacked on grounds of vagueness at that time. We see no reason to change the result of that case.

The remaining sections of the statutes under attack seem at first glance more general. Section 3021 of the Education Law provides for the removal of school employees "for the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts" while employed in the school

system. Section 105(3) of the Civil Service Law provides for the removal of civil servants from office for "treasonable or seditious" words or acts.

However, the 1958 amendments to section 105(3) greatly restricted the scope of that subsection. N.Y. Sess. Laws 1958, ch. 790, sec. 105. "Treasonable words or acts", for the purpose of 105(3), now must come within the definition of "treason" in Section 2380 of the Penal Law:

"1. Levying war against the people of the state within this state; or, 2. A combination of two or more persons by force to usurp the government of the state, or to overturn the same, shown by a forcible attempt, made within the state, to accomplish that purpose; or, 3. Adhering to the enemies of the state, while separately engaged in war with a foreign enemy, in a case prescribed in the constitution of the United States, as giving to such enemies aid and comfort within the state or elsewhere."

We do not understand the plaintiffs to challenge this definition of treason on grounds of vagueness; it is as good as can be done, and resembles the definition used in Article III, section 3, of the Federal Constitution. Even the third clause of the New York definition is narrow, having been construed to apply only in wars against foreign enemies waged by the State of New York separately from the United States. People v. Lynch, 11 Johns R. 549 (1814).

Similarly, "seditious acts and utterances", for the purpose of section 105(3), now must come within the definition of "criminal anarchy" in section 160 of the Penal Law:

"the doctrine that organized government should be overthrown by force or violence, or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means."

This is a definition closely connected with the state's legitimate interest in self-preservation, and as such is within the realm of the constitutional under *Gerende, Cramp*, and *Baggett*. We note in passing that the 1958 amendment to section 105(3) refers to section 160 of the Penal Law, entitled "Criminal anarchy defined". The looser language of section 161 of the Penal Law, entitled "Advocacy of criminal anarchy", is not now before us, although the plaintiffs seem to wish that it were.

The 1958 amendments of section 105(3) did not, by their terms, extend to the parallel language of section 3021. But the history of the two sections —born as successive sections of an act of 1917, N.Y.Sess. Laws 1917, ch. 416, secs. 2 and 3—together with the identity of language in the two sections, indicates that the two must be construed *in pari materia*. The presumption that statutes "will be construed in such a way as to avoid the constitutional question presented", Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, (1964), reinforces us in the conclusion that the words "seditious or treasonable acts or words" in section 3021, like their identical twins in section 105(3), must be defined by reference to sections 2380 and 160 of the Penal Law. When this is done, sections 3021 and 105(3)—like the separable but related Sections 3022 and 105(1) and (2)—become sharply defined, and can withstand any possible attack on grounds of vagueness.

*III. Conclusion*

We find constitutional section 105 of the Civil Service Law, Sections 3021 and 3022 of the Education Law, Section 244 of Article XVIII of the Rules of the Board of Regents, and the procedures under these statutes and rules now in effect at the State University of New York at Buffalo. We accordingly give judgment for the defendants, and deny the plaintiffs all the relief requested by them.