SENATE SELECT INVESTIGATING COMMITTEE, Petitioner

v.

LARRY HORNING, Respondent

High Court of American Samoa
Trial Division

CA. NO. 59-86

May 22, 1986

Before REES, Chief Justice, LUALEMAGA, Associate
Judge, and OLO, Associate Judge.

Counsel: For the Petitioner, Michael Lash
         For the Respondent, Roy J.D. Hall, Jr.

The Senate Select Investigating Committee was
established by a resolution of the territorial

14

Senate in order to enable the Senate "to fully explore the cause of the overspending of the 1985 annual budget, and determine what procedures need to be implemented to prevent future deficits." One of the witnesses subpoenaed to testify was Larry Horning, general manager of Southwest Marine of Samoa, Inc. Horning was commanded by the subpoena to testify and to bring documents relating to certain financial transactions between the American Samoa Government (hereafter A.S.G.) and Southwest Marine. On April 30, 1986, Horning appeared before the committee with his legal counsel and refused to testify on the matters covered in the subpoena on the ground that they were irrelevant to the committee's investigation. On May 8 the Committee applied to the High Court for a citation of contempt against Mr. Horning, in accordance with A.S.C.A. § 2.1016(b).

Counsel for respondent Horning argues that the subpoena is invalid for a number of reasons: that the matters referred to in the subpoena were irrelevant to the question of the 1985 budget deficit; that the committee failed to accord Horning due process of law as required by the United States and American Samoa Constitutions; and that the committee failed in various respects to comply with the requirements imposed by A.S.C.A. §§ 2.1003-1018 for an investigative committee to compel the testimony of witnesses.

## I. RELEVANCE

The transactions on which Mr. Horning was called to testify were Southwest Marine's lease of the Marine Railway from A.S.G.; an agreement by which A.S.G. paid for the towing of a crane from the Phillipines to American Samoa in exchange for the completion of certain construction by Southwest Marine that A.S.G. had previously undertaken to complete; and the alleged transfer of certain tools and equipment by A.S.G. to Southwest Marine. Counsel for Horning argues that these transactions are not legally relevant to the committee's inquiry into the 1985 budget deficit since they did not involve the expenditure of A.S.G. funds attributable to the 1985 budget. The towing of the crane was the only transaction in which the A.S.G. actually spent money, and it seems to be undisputed that this money was from old accounts receivable of the Marine Railway (including some accounts receivable from departments of the A.S.G.) rather than from the general revenues of the A.S.G. during 1985.

15

The standard of relevance which counsel for Horning urges the Court to impose on the committee seems far narrower than the standard the Court would impose on itself in a similar case. See Rules of Evidence of the Judiciary of American Samoa, Rule 401: "'Relevant' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.) If money was spent by A.S.G. during fiscal year 1985 that might otherwise have been available to spend on other things in order to reduce the deficit, or if valuable rights and property belonging to A.S.G. were surrendered that might conceivably have been surrendered to someone else for a different price, then those transactions would seem prima facie to be relevant to an inquiry into the "cause" of the deficit. This is true regardless of whether any money from general revenues actually changed hands, provided only that the resources expended might legally have been used for purposes for which general revenues were spent. This is not to suggest or imply that Horning, Southwest Marine, or A.S.G. were guilty of any impropriety in any of these transactions, or even that they did in fact result in a higher deficit. Nor does the Court sit in judgment on the wisdom or desirability of the inquiry. Rather, the Court merely declines to rule that inquiry into transactions involving the use or disposal of government resources is outside the competency of a committee charged with investigating a deficit.

This does not mean that anyone doing business with the government automatically subjects himself to the opening of all his books and the revelation of all his secrets to any government official who cares to ask. Counsel for Horning cites a number of federal cases for the proposition that questions must indeed be relevant to the inquiry for which a committee is legally constituted. In a few cases involving constitutionally protected rights such as speech or political association, the United States Supreme Court has even imposed quite stringent standards of relevancy on legislative committees. See, e.g., Barenblatt v. United States, 360 U.S. 109 (1959); Watkins v. United States, 354 U.S. 178 (1957). Moreover, A.S.C.A. § 2.1016 provides that a witness can be cited for contempt only for refusing to answer "relevant" questions or to provide "relevant" documents. If the committee were to inquire into Horning's political or

16

religious beliefs, or even into business matters whose connection to A.S.G. resources was so attenuated as to make it implausible to inquire whether the deficit might have been higher or lower if they had not happened, then it would violate these strictures. The subpoena actually served on Mr. Horning does not, however, suggest any such inquiry.

## II. DUE PROCESS

Counsel for the respondent urges that his client's constitutional right to due process of law is violated by this proceeding in several respects:

First, if this proceeding were one in which the respondent might be found guilty of criminal contempt and punished by a jail sentence, counsel urges that his client would be entitled to a trial by jury, the right not to be a witness against himself, and other constitutional rights accorded criminal defendants. At the May 20 hearing, however, the Court ruled that this proceeding will be construed simply as one to show cause why the respondent should not be ordered to testify before the committee and to suffer civil penalties, including possible future contempt citations, in the event he were to refuse. These issues are therefore not raised at this time.

Second, counsel urges that the proceeding violates his client's due process rights insofar as it requires him to answer irrelevant questions. This contention has already been dealt with.

Third, counsel argues that the proceeding violates his client's rights to notice, a fair hearing, and the effective assistance of counsel. Counsel's argument on these points closely parallels his argument that the committee did not comply with the statutory provisions of A.S.C.A. § 2.1003-18. In light of our holding on that question, it is unnecessary to reach the constitutional question.

## III. COMPLIANCE WITH THE "CODE OF FAIR PRACTICES."

The statute governing legislative investigatory committees in American Samoa is codified as A.S.C.A. § 2.1003-18, the "Code of Fair Practices." Counsel for respondent argues that the committee failed in several important respects to comply with the legal requirements imposed by this Code.

17

First, it is argued that the failure of S.R. 51 to state specifically that the Select Investigating Committee shall have power to subpoena witnesses and documents means that it does not have such powers ---- and indeed is not a legislative investigative committee at all, since A.S.C.A. § 2.1004(a) defines such a committee as one having the power to compel the testimony of witnesses and the production of papers. This argument is without merit, since S.R. 51 explicitly provides that the committee "shall have all powers of an investigating committee authorized by Title 2, Chapter 10." Moreover, the resolution states that the committee's "duty" shall be to "gather evidence, testimony, and relevant documents."

It is also contended that the committee is not an "interim committee" within the meaning of A.S.C.A. § 2.1016, and is therefore not authorized to apply to the High Court for a citation of contempt, since it may remain in existence until the next regular session of the legislature. In the absence of any contrary legislative history offered by either party, the most obvious meaning of the word "interim" is to designate precisely a committee such as this one, which sits between legislative sessions. It would seem that the statutory authorization to apply to the High Court for a contempt citation is designed to allow such a committee to proceed with its business without waiting for the next regular legislative session.

Counsel also urges that the powers of an investigative committee can be conferred only on a committee composed of members of both houses of the legislature, and that a committee must be vested by the whole legislature with the power to compel testimony. This is not an implausible construction of the statute, since the title of A.S.C.A. § 2.1005 is "Establishment of investigating committees by the Legislature." The text of that section, however, provides for establishment of committees not "by the legislature," but merely by "resolution or statute," without specifying a one-house or two-house resolution. Moreover, the statute also refers to "a standing or select committee of the Legislature" (A.S.C.A. § 2.1004(a)), although standing committees are customarily of only one house of the legislature. This strongly suggests that a select committee of one house is also a committee "of the Legislature" within the statute. Insofar as each house has traditionally established its own committees, a resolution of either house establishing a committee

18

therefore constitutes creation of a committee "by the Legislature" within the meaning of the title of § 2.1005.

Finally, it is urged that the committee failed to comply with the statutory requirements that "each investigative committee shall adopt rules to govern its procedures, including the conduct of hearings" (A.S.C.A. § 2.1006) and that "any person who is served with a subpoena also shall be served with . . . a copy of the rules under which the committee functions." (A.S.C.A. § 2.1011(b)). Counsel for the committee maintains that the committee fulfilled these requirements by voting "to adopt as rules the procedural provisions of Title 2, chapter 10." The problem with this argument is that one of the provisions of chapter 10 is that "each committee shall adopt rules, not inconsistent with law . . . " to govern its procedures. A.S.C.A. § 2.1006 (emphasis added). The legislature must have intended that each committee adopt rules for the conduct of its hearings beyond the general provisions of the statute itself, since otherwise § 2.1006 would be entirely superfluous. The provisions of chapter 10 are automatically binding on every investigative committee. In providing that each committee "shall" (not "may") adopt rules, the section requires that the committee do more than vote to impose on itself no rules at all other than those already imposed by law. In any case, there is no evidence in the record that the committee complied with the explicit requirement of § 2.1011(b) that it provide Mr. Horning with a copy of its rules.

The final section of the Code of Fair Practices provides that "if any investigating committee fails in any material respect to comply with the requirements of this chapter, any person subject to a subpoena who is prejudiced by such failure shall be relieved of such compliance." A.S.C.A. § 1018(b). It is difficult to be absolutely certain whether the failure of the committee to adopt rules was material and prejudicial to Mr. Horning. The Court can neither dictate to the committee the substance of the rules it may adopt nor hypothesize which rules it would have adopted if it had adopted rules. It is therefore impossible to say whether Mr. Horning would have been excused from testifying on the matters to which he objected, or allowed to read his counsel's statement into the record, if the committee had been operating under written rules of evidence adopted in advance rather than deciding

19

each question as it arose. Similarly, it is impossible to say that Mr. Horning would have refused to testify if he had had the confidence that his rights would be protected in accordance with written rules supplied to him in advance. Since A.S.C.A. § 2.1006 and 2.1011(b) seem designed to obviate precisely the kind of confrontation that occurred in this case, this Court is not prepared to hold that the committee's failure to comply with the law was immaterial or that Mr. Horning was not prejudiced thereby.

## CONCLUSION

The committee is not prohibited by law from compelling Mr. Horning to supply the evidence it seeks, but must comply with all the provisions of the Code of Fair Practices enacted by the legislature in order to do so. Specifically, the committee must adopt specific rules to govern its procedures, including the conduct of hearings. A copy of these rules must accompany any subpoena.

In accordance with A.S.C.A. § 2.1018(b), the application for a citation of contempt is denied.